J5N7CAS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                   18 CR 15 (AKH)

EUGENE CASTELLE,

         Defendant.         TRIAL

------------------------------x

                              New York, N.Y.
                              May 23, 2019
                              10:15 a.m.

Before:

               HON. ALVIN K. HELLERSTEIN,

                              District Judge
                              -and a jury-

                    APPEARANCES

GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
HAGAN C. SCOTTEN
JACOB R. FIDDELMAN
     Assistant United States Attorneys

GERALD J. McMAHON
     Attorney for Defendant

ALSO PRESENT:  DARCI BRADY, Paralegal Specialist
               CASSANDRA WILLIAMS, Paralegal

J5N7CAS1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | MR. SCOTTEN:  Your Honor, we have one very brief |
| 3 | matter we just need to put on the record but we do want to do |
| 4 | it this morning. |
| 5 | THE COURT:  Do it right now. |
| 6 | MR. SCOTTEN:  There was a newspaper article this |
| 7 | morning that contained information about a cooperating witness |
| 8 | Mr. Pennisi that was known only through the 3500.  It appears |
| 9 | to be a breach of the protective order. |
| 10 | THE COURT:  So, his name was mentioned. |
| 11 | MR. SCOTTEN:  It's not his name; it's other items that |
| 12 | were in the 3500.  Your Honor issued a protective order.  I'm |
| 13 | not asking for any remedy now, though we may.  I just need to |
| 14 | put it on the record now, because he is going to testify in six |
| 15 | hours, and the point would sort of be moot then. |
| 16 | THE COURT:  I would like to see the newspaper article. |
| 17 | What paper was it in? |
| 18 | MR. SCOTTEN:  Gangland News?  I don't know if your |
| 19 | Honor is familiar. |
| 20 | THE COURT:  A well-read publication.  OK.  I don't |
| 21 | plan to say anything to the jury. |
| 22 | MR. SCOTTEN:  No, I don't think it's necessary.  It's |
| 23 | just a subscription site, so it's very unlikely they've seen |
| 24 | it. |
| 25 | THE COURT:  How did you get it?  Never mind. |

J5N7CAS1

1          MR. MCMAHON:  Just so the record is clear, Mr. Capeci

2     has as many law enforcement sources as he has on the other

3     side.

4          THE COURT:  Did I ask you a question?

5          MR. MCMAHON:  No, Judge.

6          THE COURT:  You know maybe there is something there

7     because of sensitivity; maybe you're telling me something.

8          MR. MCMAHON:  Judge, I always like to keep the record

9     clean.

10          THE COURT:  Clean.  Sometimes the best argument is

11     silence.

12          MR. MCMAHON:  Agreed.

13          THE COURT:  OK.  Shall we get the jury?

14          MR. SCOTTEN:  I think so.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J5N7CAS1                                Leotta - Direct

1              (Jury present)

2              THE COURT:  Good morning.  I was wondering before we

3     came together what was uppermost in your mind, another exciting

4     day in testimony or the upcoming weekend.  I will not take a

5     poll.

6              OK.

7              THE COURT:  OK.  What are we up to, Mr. Fiddelman?

8              MR. FIDDELMAN:  The government calls Sal Leotta.

9      SALVATORE LEOTTA,

10         called as a witness by the government,

11         having been duly sworn, testified as follows:

12             DEPUTY COURT CLERK:  Pleasing be seated.  Please state

13    your full name and spell your last name slowly for the record.

14             THE WITNESS:  Salvatore Leotta, L-e-o-t-t-a.

15    DIRECT EXAMINATION

16    BY MR. FIDDELMAN:

17    Q.  Good morning.

18    A.  Good morning.

19    Q.  Where do you currently work?

20    A.  I'm a court security officer in the Easton Federal

21    Courthouse in Easton, Pennsylvania.

22    Q.  And what do you do there?

23    A.  I secure the court.

24    Q.  And prior to that job, where did you work?

25    A.  I worked for the New York City Police Department.

J5N7CAS1                        Leotta - Direct

1    Q.  For how long did you work at the New York City Police

2    Department?

3    A.  20 years.

4    Q.  When did you retire?

5    A.  October of 2013.

6    Q.  What was your rank when you retired?

7    A.  Detective second grade.

8    Q.  And how long had you been a detective?

9    A.  Approximately 15 years.

10            THE COURT:  What's the highest?  First grade or third

11   grade?

12            THE WITNESS:  First grade is the highest.

13            THE COURT:  And third is the lowest.

14            THE WITNESS:  Yes.  You start out as a third grade,

15   and then through promotion you work your way from second to

16   first.

17   Q.  What was the last unit that you worked in as a detective in

18   the NYPD?

19   A.  I worked in the Organized Crime Investigation Division.

20   Q.  And how long were you in the Organized Crime Investigation

21   Division?

22   A.  Approximately 13 years.

23   Q.  What were your duties and responsibilities as a detective

24   in the Organized Crime Investigation Division?

25   A.  We started organized crime cases.  We covered

J5N7CAS1                            Leotta - Direct

1   surveillances.  We prepared reports.  We covered wire coverage.

2   We listened to phone calls.

3   Q.  Directing your attention to 2012 and 2013, were you working

4   on a long-term investigation at that time?

5   A.  Yes.

6   Q.  Approximately when did that investigation start?

7   A.  Early 2012.

8   Q.  And what was your role in that investigation?

9   A.  I did surveillance, I covered the wires, and I prepared

10  reports.

11  Q.  And when you say covered the wires, what do you mean?

12  A.  You sit in a room, and you listen to intercepted phone

13  calls, either incoming or outgoing, you listen and record what

14  is being said.

15  Q.  Looking around the front part of the courtroom here, do you

16  recognize anyone from surveillances you conducted in that

17  investigation?

18  A.  Yes.

19  Q.  Who do you recognize?

20  A.  Mr. Castelle in the gray jacket and white shirt.

21          THE COURT:  The record will reflect that the defendant

22  was identified.

23          MR. FIDDELMAN:  Can we bring up Government Exhibit 3

24  in evidence, please.

25  Q.  Do you recognize that individual on your screen?

J5N7CAS1                        Leotta - Direct

1    A.  Yes, that's Big John Castellucci.

2    Q.  And have you conducted surveillance of Big John

3    Castellucci?

4    A.  Yes.

5            MR. FIDDELMAN:  Can we bring up Government Exhibit 4

6    in evidence, please.

7    Q.  Do you recognize that individual?

8    A.  That's Johnny Sideburns Cerrella.

9    Q.  And do you recognize Johnnie Sideburns Cerrella from

10   surveillances you have conducted?

11   A.  Yes.

12   Q.  Did you ever observe the defendant with Big John and Johnny

13   Sideburns?

14   A.  Yes.

15   Q.  About how many times?

16   A.  One or two, three times.

17   Q.  And where would you observe the defendant with those two

18   individuals?

19   A.  I observed them at the Cigar Vault on Staten Island, Page

20   Avenue.

21           MR. FIDDELMAN:  Can we bring up Government Exhibit 7

22   in evidence, please.

23   Q.  Do you recognize this individual?

24   A.  Yes.

25   Q.  Who is this?

J5N7CAS1                              Leotta - Direct

1    A.   That's Anthony Grecco.

2    Q.   In the course of your investigation, did you ever observe

3    Anthony Grecco and the defendant together?

4    A.   Yes.

5    Q.   Approximately how many times?

6    A.   Four, five times.

7    Q.   How did you know where to go and when to be there to

8    observe Anthony Grecco and the defendant together?

9    A.   So, we would gather information through intercepted phone

10   calls, so when the phone came over we would put down exactly

11   where they were going to meet and what time, and that's how we

12   would know where to go where they were meeting.

13            MR. FIDDELMAN:   The government now offers Government

14   Exhibit 140, which the parties have stipulated is a November

15   14, 2012 call at 10:04 a.m. between Anthony Grecco and Eugene

16   Castelle.

17            MR. MCMAHON:   No objection.

18            THE COURT:   Received.

19            (Government Exhibit 140 received in evidence)

20            MR. FIDDELMAN:   May we distribute the transcripts?

21            THE COURT:   You may.  What's the number again?

22            MR. FIDDELMAN:   140.

23            (Audio played)

24   Q.   At the beginning of that call what does Anthony Grecco call

25   the defendant when he greets him?

J5N7CAS1                        Leotta - Direct

1    A.   Boobsie.

2    Q.   And did you conduct surveillance that day, November 14,

3    2012?

4    A.   Yes.

5    Q.   Where did you conduct surveillance?

6    A.   That was at T&L Luncheonette on Cropsey Avenue in Brooklyn.

7    Q.   Approximately what time of day was it?

8    A.   I don't recall the time exactly.

9    Q.   Was it morning or lunchtime?

10   A.   Morning.

11        THE COURT:  Wait for the question before you answer.

12   Q.   What did you observe?

13   A.   I observed Mr. Castelle arrive at the location and enter

14   the luncheonette.  A short while later Mr. Grecco arrived at

15   the location and entered.  They had their meeting.  About 20

16   minutes later Mr. Grecco left the location.

17   Q.   And what are some of the places where you have observed

18   Anthony Grecco and the defendant together?

19   A.   At the luncheonette, at a diner.

20   Q.   What diner is that?

21   A.   That's the Vegas Diner on 86th Street in Brooklyn.

22   Q.   And are there any other restaurants you observed him at?

23   A.   I don't recall.

24   Q.   Did you also conduct surveillance on October 2, 2012?

25   A.   Yes.

J5N7CAS1                       Leotta - Direct

1   Q.  And where did you conduct surveillance that day?

2   A.  That was at the T&L Luncheonette.

3   Q.  And approximately what time of day was it, do you remember?

4   A.  I don't recall the time.

5   Q.  Is there something that would refresh your recollection?

6   A.  Yeah, my DD5 would help me out.

7          MR. FIDDELMAN:  I am showing the witness 3515-002,

8   page 21.

9          THE WITNESS:  OK.

10  Q.  Does that refresh your recollection as to what time of day

11  it was?

12  A.  Yes.

13  Q.  Approximately what time was it?

14  A.  It was about one o'clock in the afternoon.

15  Q.  And what did you see?

16  A.  I basically observed Mr. Grecco arrived at the location,

17  entered into the luncheonette and came back out.  A short time

18  later Mr. Castelle arrived, met with Mr. Grecco out on the

19  sidewalk there, they greeted each other.  Both men entered back

20  into the luncheonette, and then when the meeting was over I

21  observed Mr. Grecco leave the location.

22         MR. FIDDELMAN:  The government now offers Government

23  Exhibit 126, which is an October 2, 2012 call at 2:56 p.m.

24  between Anthony Grecco and Patsy Delprete.

25         MR. MCMAHON:  No objection.

J5N7CAS1                        Leotta - Direct

1              MR. FIDDELMAN:  Is it received?

2              THE COURT:  Sorry?

3              MR. FIDDELMAN:  Is it received?

4              THE COURT:  Yes.

5              (Government Exhibit 126 received in evidence)

6              (Audio played)

7              MR. FIDDELMAN:  The government now offers Government

8    Exhibit 130, which is an October 15, 2012 call at 8:45 a.m.

9    between Anthony Grecco and Eugene Castelle.

10             MR. MCMAHON:  No objection.

11             THE COURT:  Received.

12             MR. FIDDELMAN:  I'm going to play two calls in a row.

13   Would you prefer we distribute all the calls at once?  The next

14   is Government Exhibit 132.

15             THE COURT:  No objection?

16             MR. MCMAHON:  No objection.

17             THE COURT:  Both received.  And we will distribute

18   both.

19             MR. FIDDELMAN:  Thank you.

20             THE COURT:  It's 130 coming up.

21             MR. FIDDELMAN:  That's right.

22             (Government Exhibits 130 and 132 received in evidence)

23             MR. FIDDELMAN:  The first call is Government Exhibit

24   130, which is an October 15, 2012 call at 8:45 a.m.

25             (Audio played)

J5N7CAS1                        Leotta - Direct

1          MR. FIDDELMAN:  The next call is Government Exhibit

2     132, which is a call from the next day, October 16, 2012 at

3     2:54 p.m. between Anthony Grecco and Eugene Castelle.

4          (Audio played)

5     Q.   Detective, based on that call, did you conduct surveillance

6     on that date, October 16, 2012?

7     A.   Yes.

8     Q.   And where did you conduct surveillance?

9     A.   That was at the Vegas Diner on 86th Street in Brooklyn.

10    Q.   What time of day was it?

11    A.   I don't recall the time.

12    Q.   Is there something that would refresh your recollection.

13    A.   Yes, my DD5.

14         MR. FIDDELMAN:  I am showing the witness 3515-002,

15    page 22.

16    Q.   Does that refresh your recollection?

17    A.   Yes.

18    Q.   What time of day was it when you conducted surveillance at

19    the Vegas Diner?

20    A.   About 3:20 in the afternoon.

21    Q.   And what did you see?

22    A.   Basically I just observed Mr. Castelle, Anthony Grecco and

23    an unknown male white exit from the Vegas Diner.  They

24    basically stayed in the parking lot in conversation for a

25    couple minutes, and then they all left the location.

J5N7CAS1                        Leotta - Direct

1    Q.  Did they exit from the diner together?

2    A.  Yes, all three men walked out, had a conversation, and then

3    they all left separately in their cars.

4            MR. FIDDELMAN:  The government now offers Government

5    Exhibit 133, which is a call from that same day October 16,

6    2012 at 3:45 p.m. between Anthony Grecco and Patsy Delprete.

7            MR. MCMAHON:  No objection.

8            THE COURT:  Received.

9            (Government Exhibit 133 received in evidence)

10           THE COURT:  Members of the jury, pass up the

11   transcript that you have on the ledge.

12           MR. FIDDELMAN:  Government Exhibit 133.

13           (Audio played)

14   Q.  Detective, I'd like to direct your attention now to

15   September 12, 2013.  Did you conduct surveillance that day?

16   A.  Yes.

17   Q.  Where did you conduct surveillance?

18   A.  That was on Staten Island.

19   Q.  Where specifically?

20   A.  It was at the Dunkin Donuts on Highland Boulevard.

21   Q.  Do you remember approximately what time of day it was?

22   A.  In the morning, between 9 and 10:30.

23   Q.  Why were you there at that time?

24   A.  To conduct a surveillance on Mr. Castelle.

25   Q.  And how did you know to be there?

J5N7CAS1                        Leotta - Direct

1   A.  From the wire we intercepted a phone call.

2   Q.  So what did you do at that Dunkin Donuts?

3   A.  So on this surveillance I entered into the Dunkin Donuts

4   and I got on the line to make a purchase and to see who

5   Mr. Castelle was meeting with.

6   Q.  And what did you see?

7   A.  So, I basically observed Mr. Castelle in a conversation

8   with a male white sitting at a table.

9   Q.  And were you able to hear what they were talking about?

10  A.  Yes.

11  Q.  What were they talking about?

12  A.  I overheard them discussing a $50,000 loan with interest.

13  Q.  Did you hear the defendant say anything in particular?

14  A.  He basically said that he needed to know all the

15  information before he got involved.

16  Q.  Did you hear anything else?

17  A.  No.

18  Q.  What happened next?

19  A.  After I made my purchase, I exited the location.

20  Q.  Why did you leave?

21  A.  I just wanted to get in, see if I get an overhear, see who

22  he was meeting with and get out.

23  Q.  When you say overhear --

24  A.  I mean overhear his conversation.

25  Q.  Did you continue to observe the defendant at the Dunkin

J5N7CAS1                      Leotta - Direct

1    Donuts from outside?

2    A.  I did.

3    Q.  And what did you see?

4    A.  A short while later I observed Mr. Castelle exit from the

5    Dunkin Donuts.  He went to his vehicle and retrieved something

6    but it was wrapped in like a white washcloth, and then he went

7    back into the Dunkin Donuts.

8    Q.  And what happened next?

9    A.  He came back out again and retrieved like a red water

10   bottle and then went back into the Dunkin Donuts.

11   Q.  And then anything else?

12   A.  And then shortly thereafter he met with another gentleman

13   who was driving A Ford F-350 pick-up truck and had a brief

14   conversation.

15   Q.  Where did they have that conversation?

16   A.  That was outside on the street.

17   Q.  So in total how long was the defendant at this Dunkin

18   Donuts?

19   A.  About an hour and a half.

20   Q.  And how many people at least did you observe him meeting

21   with?

22   A.  Two.

23        MR. FIDDELMAN:  At this time, your Honor, the

24   government offers Government Exhibit 108, which is an August

25   24, 2012 call at 1:28 p.m. between Anthony Grecco and Eugene

J5N7CAS1                          Leotta - Direct

1    Castelle.

2              MR. MCMAHON:  No objection.

3              THE COURT:  Received.

4              Members of the jury, pass up the old transcripts on

5    the ledge, please.

6              (Government Exhibit 108 received in evidence)

7              MR. FIDDELMAN:  Government Exhibit 108.

8              (Audio played)

9    Q.  Based on this call, did you conduct surveillance that day,

10   August 24, 2012?

11   A.  Yes.

12   Q.  Where did you conduct surveillance?

13   A.  That was at T&L Luncheonette.

14   Q.  Is that the same location you previously testified about?

15   A.  Yes.

16   Q.  And what did you observe that day?

17   A.  Once again I entered into the location to see who was

18   there.  Once I got in, I got on the line and I observed

19   Mr. Castelle sitting in a booth with Anthony Grecco and two

20   unknown male whites.

21   Q.  Can you describe what this luncheonette looks like.

22   A.  Typical long luncheonette.  I think the kitchen would be on

23   the left side, and the seating is on the right, narrow.

24   Q.  And were you able to hear what Anthony Grecco, the

25   defendant and the two other men were talking about?

J5N7CAS1                        Leotta - Direct

1    A.  No.

2    Q.  What did you do then?

3    A.  After I made my purchase, I just exited the location.

4    Q.  Why did you leave?

5    A.  Just to see who was inside and what was going on, and just

6    get out as quick as possible.

7    Q.  And if you had stayed, what would have happened?

8             MR. MCMAHON:  Objection.

9             THE COURT:  Sustained.

10   Q.  Why did you feel the need to leave?

11            MR. MCMAHON:  Objection.

12   A.  I don't want to expose --

13            THE COURT:  Sustained.  Stand up when you make an

14   objection.

15            MR. MCMAHON:  Sorry.  Objection.

16            THE COURT:  Sustained.

17   A.  I don't want to expose myself to anyone --

18            MR. MCMAHON:  Judge, you sustained the objection.

19            THE COURT:  There is no pending question.

20            MR. FIDDELMAN:  At this time, your Honor, the

21   government offers Government Exhibit 111, which is a call from

22   that day August 24, 2012 at 4:03 p.m.

23            MR. MCMAHON:  No objection.

24            MR. FIDDELMAN:  Between Anthony Grecco and Gaetano

25   Zuccarello.

J5N7CAS1                          Leotta - Cross

1              THE COURT:  Received and distributed.

2              (Government Exhibit 111 received in evidence)

3              MR. FIDDELMAN:  Government Exhibit 111.

4              (Audio played)

5              MR. FIDDELMAN:  No further questions for this witness,

6     your Honor.

7              THE COURT:  Cross?

8              MR. MCMAHON:  Yes, Judge.  Thank you.

9     CROSS EXAMINATION

10    BY MR. MCMAHON:

11    Q.  Good morning, detective.

12    A.  Good morning.

13    Q.  How many surveillances would you say you did of the T&L

14    Luncheonette?

15    A.  Three, four, five.

16    Q.  And you went in there at least once?

17    A.  Yes.

18    Q.  Did you know that Mr. Castelle worked there when he was a

19    teenager?

20    A.  No.

21    Q.  Did you know that Mr. Castelle grew up in that

22    neighborhood?

23    A.  No.

24    Q.  Do you know who Andre Mormile is?

25    A.  Now I do.

J5N7CAS1                              Leotta - Cross

1    Q.  And, if I may, look at the pictures over here that are on

2    the board.

3           GX8, this is a picture of Mr. Mormile.  Do you know if

4    Mr. Mormile has any brothers?

5    A.  He has a brother Carl.

6    Q.  Any others?

7    A.  I don't know.

8    Q.  Do you know if Mr. Mormile is alive today?

9    A.  I don't know.

10   Q.  Do you know if Mr. Mormile had or has a relationship with

11   Anthony Grecco?

12   A.  I don't know.

13   Q.  Did you hear on any of these calls that were just played

14   about Mr. Grecco referring to his cousin?

15   A.  Yes.

16   Q.  And you did not learn during the course of the

17   investigation that the Mormiles were cousins with Anthony

18   Grecco?

19   A.  I don't recall them being cousins.

20   Q.  Did you ever do a surveillance at the Cigar Vault?

21   A.  Yes.

22   Q.  And that's owned by Big John Castellucci?

23   A.  I believe so, yes.

24   Q.  Now, you testified about an overhear I think it was in the

25   Dunkin Donuts.

J5N7CAS1                      Leotta - Cross

1    A.  Yes.

2    Q.  In which Mr. Castelle was talking to a gentleman, a male

3    white gentleman?

4    A.  Yes.

5    Q.  This is on September 12, 2013?

6    A.  Yes.

7    Q.  And you heard parts of the conversation?

8    A.  Yes.

9    Q.  And it was about Mr. Castelle obtaining a $50,000 loan with

10   interest?

11   A.  It was a $50,000 loan with interest.

12   Q.  And did you hear Mr. Castelle mention that that request for

13   a $50,000 loan with interest was for payroll for the

14   construction company?

15   A.  No.

16   Q.  So you heard $50,000 loan with interest but you heard

17   nothing about what it was for.

18   A.  No.

19           THE COURT:  Yes, you heard nothing.

20           THE WITNESS:  Well, yes, I heard about the $50,000

21   loan, but I didn't hear anything about payroll.

22   Q.  Now, do you remember hearing on one of the calls just

23   moments ago, GX111, the call with the sugar shaker, and there

24   was a discussion about how could you be paying somebody money

25   when your cousin needs something?  Do you remember hearing that

J5N7CAS1                        Leotta - Cross

1   call minutes ago?

2   A.  Yes.

3   Q.  And did you not learn during the course of the

4   investigation that this is a reference to the cousin Andre

5   Mormile needing $50,000 for a payroll?

6          THE COURT:  Objection sustained.

7   Q.  Do you know whether or not Mr. Castelle worked for Andre

8   Mormile's construction company?

9   A.  No.

10  Q.  Did you ever do any surveillances of Mr. Castelle other

11  than in Brooklyn and Staten Island?

12  A.  No.

13  Q.  Never went up to Westchester?

14  A.  No, I don't believe so, no.

15  Q.  Pardon me?

16  A.  I don't believe so, no.

17  Q.  Who directed you where to go for surveillances?

18  A.  Well, we get it from the wire.  We overhear a call, and

19  then from that we would set up on the locations.

20  Q.  But on your day-to-day activities as part of this

21  investigation, who was your supervisor?

22  A.  We had a couple.  We had sergeant Torellis, Lieutenant

23  Barry.

24  Q.  So they would tell you if we hear on the wire something

25  about a meeting, you would go to the ming?

J5N7CAS1                          Leotta - Cross

1   A.  It was mostly detectives; they would monitor the wires.

2   So, if they overheard it, they would pass it along or they

3   would set it up for the next day, and then somebody would cover

4   it.

5   Q.  All right.  How many law enforcement officers, detectives

6   and the like were --

7              THE COURT:  Objection sustained.

8   Q.  You've described that Lieutenant Barry and somebody else

9   and a sergeant and yourself.  How many officers were involved

10  in this investigation?

11             THE COURT:  Didn't I just sustain the objection, Mr.

12  McMahon?

13             MR. MCMAHON:  I thought it was to the form of the

14  question.  I guess it wasn't.

15             THE COURT:  Don't answer the question.

16             THE WITNESS:  OK.

17             MR. MCMAHON:  Could I have Government Exhibit 126, a

18  call, played and the transcript distributed to the jury, your

19  Honor?

20             THE COURT:  They're all stacked in front of me.

21             MR. FIDDELMAN:  Which one did you want, Mr. McMahon?

22             MR. MCMAHON:  126, please.

23             (Continued on next page)

24

25

J5NVSEC2                    Leotta - cross

1          MR. McMAHON:  If I could ask to have that call played

2    for the jury.

3          THE COURT:  Yes.  Play it again, Sam.

4          (Audio played)

5    BY MR. McMAHON:

6    Q.  Detective, during the course of your investigation, did you

7    learn who Patsy Delprete was?

8    A.  No.

9    Q.  Now, in the beginning of this call, on the first page of

10   the transcript, Mr. Grecco tells Patsy that he gave --

11         THE COURT:  What's the matter, Mr. Fiddelman?

12         MR. FIDDELMAN:  I don't believe the witness has a copy

13   of the transcript in front of him.  Can we get one to him?

14         MR. McMAHON:  Yes, please.

15   Q.  On the first page where Mr. Grecco tells Patsy Delprete

16   that he gave him -- referring to Mr. Castelle -- 300, we didn't

17   do good this week.  He was happy to get it.

18         Is it your understanding that the "300, we didn't do

19   good this week," that the number 300 was tied to profits or

20   losses?

21   A.  Yes.

22   Q.  Okay.  Later on in the conversation -- well, basically, in

23   this entire conversation, are not Patsy Delprete and Anthony

24   Grecco talking about how they can get away to give the least

25   amount of money to Eugene Castelle?

J5NVSEC2                          Leotta - cross

1    A.  That's what it sounds like.

2    Q.  Later on, in the second page, at the bottom, Mr. Grecco is

3    saying, If I make a lot of money, I'll give him 1,000.

4            Do you recall hearing that?

5    A.  Yes.

6    Q.  And he'll be happy just to get a paycheck every week out of

7    these commissions; is that right?

8    A.  Yup.

9    Q.  Now, the conversation then thereafter goes into this

10   subject of $40,000.  And on the fourth page of this transcript

11   and conversation, there's a reference -- several references to

12   a car wash.  Do you remember hearing those references?

13   A.  Yes.

14   Q.  And during the course of the investigation, did you learn

15   that Mr. Grecco and his cousins, the Mormiles, were going to

16   invest $40,000 to buy a car wash?

17           THE COURT:  Objection sustained.

18           The investigation is not -- results of the

19   investigation is not evidence in the case, nor does it bear

20   upon anything that happened on direct.

21   Q.  And on the last part of this conversation, on the last

22   page, there's reference to Mr. Castelle having said that he

23   could bring 100,000 customers to Mr. Grecco, refer to him; is

24   that correct?

25   A.  Yes.

J5NVSEC2                          Leotta - redirect

1   Q.  Presumably he'd be getting commission on each customer that

2   he refers; correct?

3   A.  Correct.

4            MR. McMAHON:  Nothing further, Judge.

5            THE COURT:  Thank you.

6            MR. FIDDELMAN:  Just a moment, your Honor.

7            Very briefly, your Honor.

8   REDIRECT EXAMINATION

9   BY MR. FIDDELMAN:

10  Q.  Mr. McMahon asked you about the $40,000 and a car wash, as

11  we heard in that call.  Directing your attention to the bottom

12  portion of page 3, going into page 4 of the transcript of

13  Government Exhibit 126, where, when referring, as Mr. McMahon

14  mentioned, to the defendant, Mr. Delprete says:  40,000 in his

15  fucking pocket.  And then later says, Car wash?  Because I

16  would know if he has a car wash.

17           THE COURT:  Mr. Fiddelman, is this argument or

18  eliciting information?

19  Q.  Does this sound to you, Detective, like Anthony Grecco took

20  out a loan for a car wash or that the defendant took out a loan

21  for a car wash?

22           THE COURT:  Objection sustained.

23           The conversation can be understood by the jury.  And

24  the jury will take the inference it wishes to take.

25           MR. FIDDELMAN:  No further questions, your Honor.

J5NVSEC2                          Anemone – direct

 1              THE COURT:  You are excused, sir.

 2              (Witness excused)

 3              MR. SCOTTEN:  Can we call our next witness, your

 4    Honor?

 5              THE COURT:  Yes.

 6              MR. SCOTTEN:  The government calls Joseph Anemone.

 7              THE COURT:  Pay attention to the oath.

 8    JOSEPH ANEMONE,

 9         called as a witness by the Government,

10         having been duly sworn, testified as follows:

11              THE COURT:  You may inquire.

12              MR. SCOTTEN:  Thank you, your Honor.

13    DIRECT EXAMINATION

14    BY MR. SCOTTEN:

15    Q.  Good morning, Mr. Anemone.

16    A.  Good morning.

17    Q.  Mr. Anemone, how old are you?

18    A.  Sixty-five.

19    Q.  And how far did you go in school?

20    A.  One year of college.

21    Q.  Do you work?

22    A.  Yes.

23    Q.  Generally, what field do you work in?

24    A.  School bus driver.

25              MR. SCOTTEN:  Can we please show the witness and the

J5NVSEC2                           Anemone – direct

1    jury what's in evidence as Government Exhibit 7.

2    Q.   Mr. Anemone, do you recognize this man?

3    A.   Yes, I do.

4    Q.   Who do you know him as?

5    A.   Anthony Grecco.

6    Q.   When do you first remember meeting Anthony Grecco, about

7    how long ago?

8    A.   Ten years.

9    Q.   And what was Mr. Grecco doing when you first met him?

10   A.   He worked for OTB as a clerk, Off Track Betting.

11   Q.   What is that?

12   A.   New York State horse racing.

13   Q.   And did you ever deal with Mr. Grecco in nonlawful betting

14   as well?

15   A.   I placed bets in OTB, yes.  He was a clerk.

16   Q.   I'm asking did you bet with him outside of OTB?

17   A.   At the time I met him?

18   Q.   At any point.

19   A.   Yes.

20   Q.   Around what time do you think you started placing illegal

21   bets with Mr. Grecco?

22   A.   2010, 2011.

23   Q.   And how long did you keep betting with Mr. Grecco?

24   A.   Seven years.  Eight years.

25   Q.   Around when did you stop, what year?

J5NVSEC2                        Anemone - direct

1    A.  2016.

2    Q.  Why did you stop?

3    A.  We were arrested.

4    Q.  Just you and Mr. Grecco?

5    A.  There was other people.

6    Q.  And were you arrested simply for placing bets?

7    A.  No.

8    Q.  What else were you doing?

9    A.  I had a sheet with him.

10   Q.  And just briefly, what does it mean to have a sheet?

11   A.  I had players that would call in -- actually, this was the

12   Internet.  And I -- their accounts, plus if they lost or won,

13   that's how I made money.

14              MR. SCOTTEN:  Your Honor, I'd like to read a portion

15   of a stipulation and offer Government Exhibit 143, which is a

16   call between Anthony Grecco and Mr. Anemone on December 3rd,

17   2012 at 9:35 a.m.

18              THE COURT:  Received.

19              (Government's Exhibit 143 received in evidence)

20              THE COURT:  We'll take our mid-morning break.

21              Let's break for ten minutes please.

22              Leave your pads on the chair.

23              Don't discuss the case.

24              (Jury not present)

25              (Recess)

J5NVSEC2                        Anemone - direct

 1              (Jury present)

 2              THE COURT:  Mr. Anemone, you remain under oath.

 3              Mr. Scotten will continue the examination.

 4              MR. SCOTTEN:  I think we were handing out, your Honor,

 5    the transcript for 143.

 6              Can we please play 143.

 7              THE COURT:  What are we playing?

 8              MR. SCOTTEN:  Government Exhibit 143, your Honor.

 9              (Audio played)

10    BY MR. SCOTTEN:

11    Q.  Mr. Anemone, who are the two parties on this call?

12    A.  Excuse me?

13    Q.  Who are the speakers on this call?

14    A.  Anthony Grecco and myself.

15    Q.  What did you just discuss?

16    A.  The figures for the week for the players.

17    Q.  So, for example, when you said "36 minus 204," what does

18    that mean?

19    A.  The account of 36 lost $204.

20    Q.  And what does "36" represent?

21    A.  That was a number we would give each customer, a different

22    number, with the Internet.

23              MR. SCOTTEN:  Ms. Brady, keep playing.

24              (Audio played)

25              MR. SCOTTEN:  Can we pause it again.

1    Q.  Mr. Anemone, what was being discussed there?

2    A.  The end result of what I have to give him.

3    Q.  So that week, how much money were you giving Anthony

4    Grecco?

5    A.  Want to play it back?  I'll tell you.

6    Q.  When you said, "I got to give you 4350," was that $4,350?

7    A.  That is correct.

8           MR. SCOTTEN:  If we can keep playing.

9           THE COURT:  Over what period of time is that?

10          THE WITNESS:  One week, your Honor.

11          (Audio played)

12   BY MR. SCOTTEN:

13   Q.  Now, Mr. Anemone, were you completely honest in your

14   dealings with Mr. Grecco?

15   A.  No.

16   Q.  What did you do that was not honest with Mr. Grecco?

17   A.  Some players I made up for myself.

18   Q.  You made up bettors who are not real bettors?

19   A.  Correct.  I was doing it.

20   Q.  Why did you bet under other people's names?

21   A.  Because I was getting a percentage that was higher than the

22   interest I had to pay on the bets.

23   Q.  So can you play it out a little bit more how that works.

24   A.  He was giving me something like 25 percent of the losses.

25   And the winnings didn't come off.  So if my players -- the guys

J5NVSEC2                      Anemone - direct

1    I made up -- lost 600, and the other two won 400, it didn't

2    come out to plus 200; he still let me use the 600.

3    Q.  So if I'm being accurate here, essentially --

4    A.  He never took -- sorry.

5    Q.  When you won, you won.  But when you lost, you only gave

6    him 75 percent, because you were keeping some as the runner?

7    A.  Correct.  It only cost me 10 percent to bet; so I was

8    making 15 percent.

9    Q.  Are you familiar with something called a red figure in

10   sports betting?

11   A.  Yes.

12   Q.  What's a red figure?

13   A.  If you have players and they win, you would have to make

14   that up under normal circumstances for the next following week.

15   For example, if your players won $1,000 that week, and next

16   week they lost 2,000, you would be plus only 1,000.  But with

17   Tony, there was no red with me.

18   Q.  So Mr. Grecco didn't make you keep a red figure?

19   A.  Not at all.

20   Q.  If he had, would that have defeated your scheme?

21   A.  100 percent.

22   Q.  Did Mr. Grecco eventually catch on to what you were doing?

23   A.  Yes, in a way that I wasn't aware of, but, yes.

24   Q.  How did Mr. Grecco figure out what you were doing?

25   A.  The bets were put in through the Internet, and it was the

J5NVSEC2                         Anemone - direct

1   same -- I forget, PP something, it's called that, could tell

2   when you're on a computer, what computer you're using.

3   Q.  Are you referring to an IP address?

4   A.  IP, I'm sorry.  And all the bets were coming from the same

5   IP.

6   Q.  When you say "all the bets," how many --

7   A.  Mine.

8   Q.  Did you also have real --

9           THE COURT:  Wait for the question to be finished --

10          THE WITNESS:  Sorry.

11          THE COURT:  -- before you answer.

12  Q.  After Grecco figured out that you were making up some of

13  your bettors, what did you do?  How did things change?

14  A.  I just stopped.  Those accounts were closed.

15  Q.  And were you allowed to bet under your own name still?

16  A.  Yes.

17  Q.  During the time before this happened, when you were still

18  running a sheet for him, did you know whether he had other

19  sheet holders?

20  A.  Yes.

21  Q.  Did you ever meet any of them personally?

22  A.  No.

23  Q.  Do you know whether he had a partner?

24  A.  Yes.

25  Q.  And did you ever meet this partner?

```
 1    A.  Yes.
 2    Q.  What was his name?
 3    A.  Joe.
 4    Q.  And under what conditions did you meet Joe?  Why did you
 5    meet Joe?
 6    A.  I originally met Joe when he used to be a collector with
 7    Anthony for another bookmaker.
 8    Q.  And did Joe and Grecco keep being partners until 2016, when
 9    everybody was arrested?
10    A.  No.
11    Q.  Did Grecco ever tell you why he and Joe ceased being
12    partners?
13    A.  He originally told me that Joey was going around borrowing
14    money.
15    Q.  Why was that a problem?
16    A.  And using the business as the backup.  And Tony was not
17    aware of it.
18    Q.  Did you later learn of another problem?
19    A.  Yes.
20    Q.  What was that problem?
21    A.  That some -- Joey went to someone to try to take a
22    percentage of his business.
23    Q.  When you say "someone," what kind of person did Joey go to?
24            MR. McMAHON:  Objection.
25    Q.  How did Grecco describe it to you?
```

1           THE COURT:  Just a minute.

2           Is that objected to also, how Grecco described it?

3           MR. McMAHON:  Yes, your Honor.

4           THE COURT:  I need a sidebar please.

5           (At sidebar)

6           THE COURT:  Is the objection hearsay?

7           MR. McMAHON:  Yes, Judge.

8           MR. SCOTTEN:  And this is one of the calls your Honor

9    ruled on.  It's admissible both as a co-conspirator statement

10   and also a statement against Grecco's penal interest.

11          MR. McMAHON:  Judge, it's a different conspiracy.  And

12   it's not in furtherance of this conspiracy.

13          MR. SCOTTEN:  So the law is clear.  It can be in

14   furtherance of any conspiracy of which the defendant is a

15   member.  And I think we've more than met the preponderance

16   burden.  Defendant, Mr. Grecco, Mr. Anemone are all part of the

17   same gambling conspiracy.

18          In addition, it only has to further the conspiracy,

19   which this clearly does.  They are discussing the operation of

20   the business.

21          And finally, Mr. McMahon's points don't go to the

22   penal interest exception, which also applies.

23          MR. McMAHON:  Deal with one at a time.

24          The conspiracy, my client is not a member of the

25   conspiracy between Grecco and Joe and some unnamed third party

J5NVSEC2                         Anemone - direct

1    that was trying to get into the business.

2                MR. SCOTTEN:  That is correct, he doesn't need to be a

3    party with a third person; he just needs to be a partner with

4    Grecco, which he obviously is.

5                THE COURT:  How do I know another conspiracy hasn't

6    been laid out *prima facie*?

7                MR. SCOTTEN:  So, your Honor, thus far the proof that

8    Grecco and the defendant are in the same conspiracy has been, I

9    think, pretty overwhelming.

10               THE COURT:  With Castelle.

11               MR. SCOTTEN:  Correct.

12               And then Mr. Anemone just testified that he was a

13   sheet holder for Grecco in that same gambling operation.  And

14   we just played a call to reinforce that.

15               THE COURT:  This doesn't seem to be part of that

16   conspiracy.

17               MR. SCOTTEN:  I'm sorry, what doesn't, your Honor?

18               THE COURT:  This new guy that's come into the picture.

19               MR. SCOTTEN:  So to be clear, Mr. Anemone's testimony

20   is going to be that this new guy who came into the picture, the

21   defendant's role in the conspiracy was to kick him out.  We are

22   not alleging that this new guy is part -- I'm not going to

23   elicit any statements by this new guy.

24               THE COURT:  So why is that relevant?

25               MR. SCOTTEN:  Because that actually is how

J5NVSEC2                          Anemone – direct

1    Mr. Castelle -- that was his role in the business.

2              Originally he comes in --

3              THE COURT:  A replacement.

4              MR. SCOTTEN:  -- essentially to remove another wiseguy

5    who is doing extortion.  They recruit Castelle to kick him out;

6    and Castelle comes in as the wiseguy of the business.

7              THE COURT:  He comes into the conspiracy for gambling?

8              MR. SCOTTEN:  Correct.

9              THE COURT:  Or the racketeering?

10             MR. SCOTTEN:  Both.  In this case, both.

11             THE COURT:  So that you represent you're going to

12   prove that.

13             MR. SCOTTEN:  Absolutely, your Honor.

14             THE COURT:  Objection overruled.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  I overrule the objection.

3    BY MR. SCOTTEN:

4    Q.  Mr. Anemone, how did Mr. Grecco describe this other person

5    that Joey brought into the operation?

6    A.  Wiseguy.

7    Q.  And do you know what Grecco did to handle the situation

8    with a wiseguy being brought in?

9    A.  Yes.

10   Q.  What did he do?

11   A.  Went to his cousin.

12   Q.  And through his cousin, did Mr. Grecco develop a solution?

13   A.  Yes.

14   Q.  What was that solution?

15   A.  His cousin said he had a friend who could take care of the

16   problem.

17   Q.  And do you know if your conversations with Mr. Grecco, who

18   this friend was, what was significant about this friend that

19   allowed him to help?

20         THE COURT:  Let's take one question at a time.

21         Who was the friend?

22   A.  He told me it was a guy named Boobsie.

23   Q.  And what about Boobsie would allow him to help in the

24   situation?

25   A.  He told me that he think he could outrank him or something

J5NVSEC2                          Anemone – direct

1   like that.

2   Q.  Outrank him with what?

3   A.  A position.

4   Q.  Position in what?

5   A.  I guess a connected guy.

6           THE COURT:  Is there an organization where there's

7   ranking?  Are you talking about an organization?

8           THE WITNESS:  I guess organized crime.

9           THE COURT:  Any particular aspect of it?

10          THE WITNESS:  Not that I know of.

11  Q.  Well, when you say "organized crime" --

12          THE COURT:  So all you know is -- is that what you

13  were told, that this Boobsie fellow was going to outrank or

14  does outrank someone with whom you were involved?

15          THE WITNESS:  Tony told me that his cousin said

16  that --

17          THE COURT:  Tony what?

18          THE WITNESS:  Tony said that his cousin said that he

19  had somebody who could take care of the problem, because he

20  could probably outrank him.

21          MR. McMAHON:  Judge, I renew my objection.

22          THE COURT:  Overruled.

23  BY MR. SCOTTEN:

24  Q.  And do you know, based on your dealings with Mr. Grecco,

25  whether Boobsie did, in fact, help with this problem?

J5NVSEC2                        Anemone – direct

1    A.  Yes, I do.

2    Q.  And what was the result of that?

3    A.  The original gentleman was no longer involved.

4    Q.  And who was he replaced by?

5    A.  I was told Boobsie.

6    Q.  And to be clear, have you ever met Boobsie?

7    A.  No, I have not.

8         THE COURT:  Remind me, did you know the name of the

9    fellow who was replaced?  Did you testify?

10        THE WITNESS:  Did I testify?

11   Q.  The wiseguy who Boobsie replaced, did you know that

12   wiseguy's name?

13   A.  The original?

14   Q.  Correct.

15   A.  No, I do not.

16        THE COURT:  And this fellow's name you don't know, was

17   he a partner with Grecco?

18        THE WITNESS:  I do not know.

19        THE COURT:  What was his relationship to Grecco?

20        THE WITNESS:  He was asking for a percentage of his

21   business.

22        THE COURT:  Of Grecco's business?

23        THE WITNESS:  Of Grecco's business.

24   BY MR. SCOTTEN:

25   Q.  And just to be clear, what was the name of Grecco's

J5NVSEC2                         Anemone – direct

1    partner?

2    A.   Joe.

3    Q.   And did you testify a minute ago that Joe brought this

4    other wiseguy in, not Boobsie?

5    A.   Correct.

6    Q.   And then Grecco had Boobsie kick that guy out?

7    A.   Correct.

8    Q.   Did Boobsie receive anything in return for getting rid of

9    this other wiseguy?

10                  MR. McMAHON:  Objection.

11   Q.   Based on what you know from your discussions with

12   Mr. Grecco in the gambling business.

13                  MR. McMAHON:  Objection, your Honor.

14                  THE COURT:  Did Mr. Grecco tell you if Boobsie

15   received anything in return for getting rid of the fellow Joe

16   brought in?

17                  THE WITNESS:  He took a piece of the business.

18   Q.   Did he say how large a piece?

19   A.   I recall I think he said 25 percent.

20   Q.   In addition to 25 percent of the business, did Boobsie

21   receive anything else --

22                  MR. McMAHON:  I object to leading, your Honor.

23                  THE COURT:  Overruled.

24   Q.   Did he receive anything other than 25 percent?

25   A.   He told me that he asked him to borrow $40,000.

J5NVSEC2                              Anemone – direct

1  Q.  To be clear, who asked who to borrow $40,000?

2  A.  Boobsie asked Anthony to borrow $40,000.

3  Q.  Did Grecco say that Boobsie was borrowing the $40,000 from

4  Grecco?

5  A.  I think he asked him to go get it, something like that.

6  Q.  From another party?

7  A.  From another party, yes.

8          THE COURT:  So Grecco was not the lender; he was the

9  intermediary?

10         THE WITNESS:  Correct.

11 Q.  And who got the money from the loan?

12 A.  Boobsie.

13 Q.  Who ended up paying back the loan?

14 A.  Tony.

15 Q.  This is all Grecco, Anthony we're talking about?

16 A.  Anthony, yeah.  I call him Tony.

17 Q.  Did Grecco ever seek your advice concerning Boobsie's role

18 in the operation?

19 A.  Yes.

20 Q.  And in general terms, what advice did you give to Grecco?

21         MR. McMAHON:  Objection.

22         THE COURT:  Sustained as to form.

23 Q.  Did you advise --

24         THE COURT:  Tony have a last name?

25         THE WITNESS:  Grecco.

J5NVSEC2                          Anemone - direct

1              THE COURT:  So Grecco was an intermediary with regard

2       to the $40,000 loan; that someone else gave it, and now you're

3       saying that it was Grecco who gave it.

4              THE WITNESS:  No, I did not say --

5              THE COURT:  I misunderstood.

6              MR. SCOTTEN:  I'm asking about a new subject, your

7       Honor.

8              THE COURT:  I know you are.  I'm going back.

9              THE WITNESS:  Grecco went to get it, and then he

10      supposedly gave it to Boobsie.

11             THE COURT:  So Grecco was not the lender; he was the

12      intermediary.

13             THE WITNESS:  Correct.

14      BY MR. SCOTTEN:

15      Q.  As originally understood, who was supposed to pay the loan

16      back?

17             MR. McMAHON:  Objection.

18             THE COURT:  Sustained.  Better form.

19      Q.  What did Grecco tell you about who was supposed to pay --

20             THE COURT:  Let's have a conversation.

21             Were there certain conversations at certain times?

22             Proceed that way.

23             MR. SCOTTEN:  Your Honor, I think I'll just wait till

24      we play the recording.  It might be easier.

25      Q.  Did Grecco ever seek your advice concerning Boobsie's role

J5NVSEC2                          Anemone - direct

1    in this gambling operation?

2    A.  Yes.

3    Q.  Did you provide that advice?

4    A.  Yes.

5    Q.  Without saying exactly what you said, what was the general

6    content of your advice?  What were you trying to direct him to

7    do?

8              MR. McMAHON:  Objection.

9              THE COURT:  Sustained.

10             Is this going to be a conversation that's played?

11             MR. SCOTTEN:  It will, your Honor.

12             THE COURT:  Why don't you do it then.

13             MR. SCOTTEN:  Sure.

14   Q.  I'm going to ask you a bit about your past.

15             Mr. Anemone, when is the first time you are arrested

16   for being involved in an illegal sports betting operation?

17   A.  Was it my first time?

18   Q.  Yes.

19   A.  No.

20   Q.  Around when was the first time you were arrested for --

21   A.  2001.

22   Q.  And that's for sports betting?

23   A.  Yes.

24   Q.  How long have you been involved in sports betting back

25   then?

J5NVSEC2                        Anemone - direct

1    A.  About five years.

2    Q.  And in addition to sports betting, did you commit any other

3    crimes at that time period?

4    A.  Yes.

5    Q.  What else?

6    A.  Usury.

7    Q.  And what did you do that made you guilty of usury?

8    A.  Well, when the players usually couldn't play the full

9    amount, they would say, you know, Can I pay a little bit?  And

10   I would say okay.  I would add a little interest on.

11   Q.  To be clear, did you make a threatening phone call in an

12   attempt to collect one of these debts?

13   A.  With the sports?

14   Q.  With one of the debts, yes.

15   A.  With my sports?

16   Q.  Yes.

17   A.  No.

18   Q.  Did you ever make a threatening phone call to collect a

19   debt?

20   A.  Yes.

21   Q.  When you were arrested in 2016 in the state case, did you

22   decide to cooperate with law enforcement?

23   A.  Yes.

24   Q.  Did you enter a cooperation agreement with the Brooklyn

25   District Attorney's Office?

J5NVSEC2                        Anemone - direct

1    A.  Yes.

2    Q.  Did you plead guilty to any crimes as a result of that

3    agreement?

4    A.  Yes.

5    Q.  Do you remember what they were?  Just in general terms.

6    A.  I think it was promoting gambling.

7    Q.  Did you plead guilty to both a felony and misdemeanor

8    version of promoting gambling?

9    A.  Yes.

10   Q.  What do you understand your obligations under your

11   agreement with the Brooklyn District Attorney's Office to be?

12   A.  What's my obligation with them?

13   Q.  Correct.

14   A.  I don't know how to really answer that.

15   Q.  If they call you to testify, do you have to testify in

16   their cases?

17           MR. McMAHON:  Judge --

18           THE COURT:  That's okay.

19   Q.  Do you have to testify in the Brooklyn District

20   Attorney's --

21           THE COURT:  You're not going to go into this.  Stop.

22           If you're going to go into it, I'm allowing the

23   question.

24           MR. McMAHON:  Yes, Judge, I am going to go into it.

25           THE COURT:  The question is allowed.

J5NVSEC2                         Anemone - direct

1    Q.  Do you have to testify if the Brooklyn's District Attorney

2    Office calls you to testify?

3    A.  Yes.

4    Q.  Do you have to testify truthfully?

5    A.  Yes.

6    Q.  If you comply with those and whatever other obligations you

7    have, what do you understand you're going to receive from the

8    Brooklyn District Attorney's Office?

9    A.  Felony knocked down to a misdemeanor.

10   Q.  So you will only be sentenced to the misdemeanor?

11   A.  Correct.

12   Q.  Are you testifying here because of that agreement?

13   A.  No.

14   Q.  Do you have any agreement with the federal government?

15   A.  I guess, yes.

16   Q.  What agreement do you think you have?

17   A.  No, I'm sorry.  No.

18   Q.  In fact, when you first met the federal government, did you

19   agree to testify?

20   A.  No.

21   Q.  Why did you refuse to testify?

22   A.  Because originally it was supposed to be about Anthony

23   Grecco.  And I was told by my lawyer --

24              THE COURT:  Please come up.

25              (Continued on next page)

J5NVSEC2                              Anemone – direct

1              (At sidebar)

2              THE COURT:  I take it, Mr. McMahon, you don't want to

3    allow the witness to say that he's got immunity, right?

4              MR. McMAHON:  No, I want him to say that he has

5    immunity.  I don't want him to say that he's -- didn't want to

6    testify against Castelle out of fear.

7              MR. SCOTTEN:  Which is what he would say.

8              THE COURT:  That's okay.

9              I'll allow that question.  I'll allow that question.

10             I thought you wanted to keep out the fact of his order

11   of immunity.

12             MR. McMAHON:  No, no.

13             MR. SCOTTEN:  Which I'm going to get to in a second.

14             THE COURT:  Okay.  That's why he didn't know how to

15   answer the agreement, because he thought this is an agreement.

16             MR. SCOTTEN:  Or he's very confused, which is pretty

17   standard for him.

18             THE COURT:  I don't think he's confused.  Okay.

19             (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2    BY MR. SCOTTEN:

3    Q.  And why were you willing to testify against Grecco, but not

4    in this case?

5    A.  Didn't know the gentleman; don't want to get involved.  I'm

6    a family man; don't need any problems.

7    Q.  So why are you testifying today?

8    A.  I was subpoenaed.

9    Q.  Did you also receive a compulsion order, also known as an

10   immunity order?

11   A.  Yes.

12   Q.  Who issued that order?

13   A.  The federal government.

14   Q.  Who issued the order yesterday, when you were sitting right

15   here?

16   A.  The judge.  The judge.

17   Q.  What does this order require you to do?

18   A.  Tell the truth.

19   Q.  If you testify truthfully, can anything you say here be

20   used against you in a prosecution or investigation?

21   A.  No.

22   Q.  Does the order prevent you from being prosecuted based on

23   other things, evidence other than your statements?

24   A.  No.

25   Q.  Does it protect you if you don't tell the truth?

J5NVSEC2                              Anemone - direct

1    A.  No.

2    Q.  Mr. Anemone, I think a second ago you said you and Grecco

3    spoke about his arrangement with Boobsie?

4    A.  Yes.

5    Q.  Were some of those conversations over the telephone?

6    A.  Yes.

7              MR. SCOTTEN:  Your Honor, I'd like to offer Government

8    Exhibit 129.

9              THE COURT:  Received.

10             (Government's Exhibit 129 received in evidence)

11             MR. SCOTTEN:  Which is a call.

12             And if we can hand up transcripts, your Honor?

13             THE COURT:  Yes.

14             MR. SCOTTEN:  This is a call between Mr. Anemone and

15   Mr. Grecco on October 15th -- October 10th of 2012.

16             THE COURT:  It's better that you listen.

17             THE WITNESS:  Oh, okay.

18             MR. SCOTTEN:  If we can please play --

19             (Audio played)

20             MR. SCOTTEN:  If we can pause there.

21   BY MR. SCOTTEN:

22   Q.  Before I ask you about that, is this part of a much longer

23   conversation?

24   A.  Was this the conversation?

25   Q.  Was what you just heard part of a much longer call?

J5NVSEC2                    Anemone - direct

1    A.  I guess so, yes.

2    Q.  Have you listened to it fairly recently?

3    A.  Yes.

4    Q.  And this part of the conversation we just heard, who is the

5    person here who took part of Mr. Grecco's business?

6    A.  Boobsie.

7    Q.  And the loan, $40,000 loan, who received that money?

8    A.  Boobsie.

9    Q.  And do you hear a reference to 15 large?

10   A.  Yes.  Yes.

11   Q.  What does that 15 large refer to?

12   A.  $15,000.

13   Q.  And who paid that?

14   A.  I guess Tony.

15           MR. McMAHON:  Objection to guessing.

16   Q.  Were you part of this conversation?

17           THE COURT:  Yes.

18   A.  Okay.  So what page are they reading on?  Because I need

19   the glasses again.  Page 2 is it on?

20   Q.  I think we're looking at page 2, line 9; so about a third

21   of the way down.

22   A.  Repeat the question.

23   Q.  When Grecco says, I need 15 large, plus the 25, 25 percent,

24   who did you understand Grecco to say he gave the 15 large to?

25   A.  Boobsie.

J5NVSEC2                        Anemone - direct

1    Q.  To be clear, did you hear Boobsie's name said in this

2    conversation?

3    A.  No.

4    Q.  So how do you know it's Boobsie?

5    A.  Because he told me previously the situation that he's in.

6            THE COURT:  Don't go by what you heard from

7    Mr. Scotten.  Independent recollection.  How do you know?

8            THE WITNESS:  No, I heard from Tony Grecco.

9            MR. SCOTTEN:  He didn't mean me, your Honor.

10           THE WITNESS:  No, I meant Tony Grecco, your Honor.

11   Q.  Why not say Boobsie's name on the phone or his nickname?

12           THE COURT:  What's the question?

13           MR. SCOTTEN:  Why he didn't say Boobsie's name in this

14   conversation.

15           MR. McMAHON:  Objection.

16           THE COURT:  Sustained.

17   BY MR. SCOTTEN:

18   Q.  I may have asked you this, I apologize:  15 large, what is

19   15 large?

20   A.  $15,000.

21           MR. SCOTTEN:  We can now pick up at six minutes and

22   seven seconds please.

23           (Audio played)

24           MR. SCOTTEN:  We can stop there.

25   Q.  Okay.  Starting at the beginning of this portion, on page

J5NVSEC2                        Anemone - direct

1   3, what does "40 dimes" refer to?

2   A.  $40,000.

3   Q.  A dime is $1,000?

4   A.  Correct.

5   Q.  And who is Mr. A in this conversation?

6   A.  Boobsie.

7   Q.  And who is Mr. B?

8   A.  I have no idea.

9   Q.  But is he the lender?

10  A.  Correct.

11  Q.  But you never met this man?

12  A.  No, I have not.

13         MR. SCOTTEN:  Can we play the next portion please.

14         (Audio played)

15         MR. SCOTTEN:  We can pause there please.

16  Q.  Who were you referring to that was recommended by

17  Mr. Grecco's cousin?

18  A.  Who am I -- say that again?

19  Q.  Here when you say, "This motherfucker was recommended by

20  your cousin," who are you referring to?

21  A.  Boobsie.

22         MR. SCOTTEN:  If you can play the next part please.

23         (Audio played)

24         MR. SCOTTEN:  You can pause it there.

25  Q.  Mr. Anemone, can you explain what's going on here, if you

J5NVSEC2                          Anemone - direct

1    recall?

2    A.  It sounds like --

3    Q.  From your experience in the conversation --

4    A.  When he --

5            THE COURT:  Excuse me.

6            Mr. Anemone.

7            THE WITNESS:  Yes, sir.

8            THE COURT:  Testify as to your recollection of what

9    went on.

10   A.  When he won from the players, Boobsie got paid.  When he

11   lost, he didn't pay the 25 percent that was due.

12   Q.  So to be clear --

13           THE COURT:  So Boobsie was keeping the winnings and

14   not paying the losers.

15           THE WITNESS:  That is exactly what he said.

16           MR. SCOTTEN:  We can play the next portion.

17           (Audio played)

18           MR. SCOTTEN:  Pause it there please.

19   Q.  Who is it that Mr. Grecco said he was sure was a made guy?

20   A.  Boobsie.

21   Q.  The phrase you used, "on the shelf," what did you mean by

22   that?

23   A.  I guess I read that in a --

24   Q.  The question is just what you meant by it.

25           MR. McMAHON:  Your Honor, objection.

J5NVSEC2                        Anemone - direct

1          THE COURT:  No, no, it's a good question.

2          What did you mean?

3          MR. McMAHON:  No, Judge, he interrupted him in the

4     answer.  He said he read it.

5          THE COURT:  He started by saying "I guess I," and --

6     since we don't want guessing, we want recollection, he was

7     legitimately stopped.

8  Q.  When you said it, what do you remember meaning by it?

9     That's all I'm asking.

10 A.  That he's no longer active.

11         THE COURT:  Who's "he"?

12         THE WITNESS:  Boobsie.

13 Q.  To your knowledge, did Grecco ever refuse to pay Boobsie?

14         MR. McMAHON:  Objection.

15         THE COURT:  Sustained.

16         MR. SCOTTEN:  I think we can pick up the next part

17    please.

18         THE COURT:  Boobsie was no longer in the business.

19    What time are we talking about?  When you said that Boobsie was

20    no longer in the business --

21         MR. SCOTTEN:  I want to be clear, your Honor.  The

22    witness never said Boobsie was no longer in the business.

23         MR. McMAHON:  No longer active, your Honor.

24         THE COURT:  No longer active in the business.

25         MR. McMAHON:  Active in organized crime.

J5NVSEC2                        Anemone - direct

1         MR. SCOTTEN:  On the shelf.

2         MR. McMAHON:  What the witness said was --

3         THE COURT:  Let's do this at sidebar if we need it,

4    but I don't think we need it.

5         MR. SCOTTEN:  I don't think so.

6    BY MR. SCOTTEN:

7    Q.  This call was stipulated to be on October 10th, 2012.

8         Did you have any knowledge of what time period

9    Mr. Grecco was talking about when he's making these comments?

10   A.  What time period?

11   Q.  Right.

12   A.  No.

13        MR. SCOTTEN:  If we can pick up the next portion.

14        (Audio played)

15        MR. SCOTTEN:  You can pause it there.

16   Q.  So in this conversation, the Joey at the beginning, threw

17   Grecco under the bus with another wiseguy.  Which Joey is that?

18   A.  His original partner.

19   Q.  So this first wiseguy, just to be clear, is that Boobsie?

20   A.  No.

21   Q.  The wiseguy who was above this other wiseguy, who is that?

22   A.  Boobsie?

23   Q.  This conversation, is this about things that were going on

24   with Mr. Grecco at the time of the conversation?

25   A.  Yes.

J5NVSEC2                          Anemone - direct

1            MR. SCOTTEN:  Ms. Brady, can you back that up.

2            (Audio played)

3   Q.  And when Mr. Grecco says he's looking for an envelope at

4   Christmastime --

5            MR. McMAHON:  Objection.

6   Q.  -- participation in the conversation, who did you

7   understand him to be referring to?

8   A.  Boobsie.

9            THE COURT:  The objection is overruled.

10           MR. SCOTTEN:  Your Honor, I just want to play one more

11   call.

12           Your Honor, can we hand out two transcripts?  We're

13   going to play them very close in time together.  These are

14   Government Exhibits 160 and 161.

15           MR. McMAHON:  No objection.

16           MR. SCOTTEN:  We're actually going to start with

17   Government Exhibit 161.  It's a call between Anthony Grecco and

18   Joseph Anemone at 4:30 on October 11, 2012.

19           And your Honor, are these exhibits received?

20           THE COURT:  Yes.

21           (Government's Exhibits 160, 161 received in evidence)

22           MR. SCOTTEN:  This is 161.  Actually, wait a second.

23           THE DEPUTY CLERK:  What are we starting with?

24           MR. SCOTTEN:  Start with 161.  But I'm concerned the

25   right transcript didn't go out.

J5NVSEC2                          Anemone - direct

1              JUROR:  We have 160T and 161.

2              MR. SCOTTEN:  Since I'm not allowed to speak to the

3    jury, your Honor --

4              THE COURT:  What's going on, folks?  You have 163 and

5    161?

6              JUROR:  No.

7              MR. SCOTTEN:  I believe they have the correct

8    transcripts.

9              THE COURT:  Just a minute please.

10             JUROR:  We aren't sure if it's 161 or --

11             THE COURT:  You don't know which one is which.

12             JUROR:  No, we have 160 and 161, and they said we are

13   starting with 161.

14             THE COURT:  Okay.  Hold on.

15             THE WITNESS:  I don't know which one it is either.

16             Which one should we have.

17             THE COURT:  Just a minute.  Let the judge conduct

18   this.

19             THE WITNESS:  I'm sorry.  Help out a little bit.

20             THE COURT:  Please identify the call that you're going

21   to play now.

22             MR. SCOTTEN:  161, your Honor.

23             THE COURT:  161.  And what's the date of it?

24             MR. SCOTTEN:  October 11th, 2012.  Both calls are

25   October 11th, 2012.

1          THE COURT:  What time is it?

2          MR. SCOTTEN:  It's going to say 16:30 or 4:30 p.m.

3          THE COURT:  Okay.  Let's wait till the jury gets it.

4  Let's wait till Mr. Anemone gets it.

5          THE WITNESS:  Got it.

6          THE COURT:  Okay.  Play it.

7          (Audio played)

8          MR. SCOTTEN:  Ms. Brady, you can pause it there.

9  BY MR. SCOTTEN:

10 Q.  So this first part of the call, what is being discussed,

11 Mr. Anemone?

12 A.  Excuse me?  I didn't hear you.

13 Q.  I'm sorry.

14      What is being discussed in this part of the call?

15 A.  Accounts were suspended.

16      Do you want me to follow up a little more?

17 Q.  Accounts where?

18 A.  With the sports -- his accounts with the sports --

19          THE COURT:  With the bettors.

20 A.  Well, the accounts were suspended by the place that is like

21 the original owner, you know, where it starts from.

22 Q.  Did the website suspend the accounts?

23 A.  The website suspended the accounts, because you have to pay

24 them Monday or Tuesday, and I think he didn't pay them.  And

25 they don't wait.  They just shut him down.

J5NVSEC2                     Anemone - direct

1   Q.  You see a reference to Mr. A calling Grecco?

2   A.  Yes, I do.

3   Q.  Who is Mr. A?

4   A.  Boobsie.

5          MR. SCOTTEN:  I think we can start again.  There's

6   going to be some silence for a second.

7          (Audio played)

8          MR. SCOTTEN:  Ms. Brady, if we can now play 160, which

9   the parties have stipulated is a call that occurred one hour

10  and 29 minutes before the call we just heard, between Anthony

11  Grecco and Eugene Castelle.

12         (Audio played)

13  Q.  Mr. Anemone, have you ever heard that call before?

14  A.  No.

15  Q.  Do you recognize both voices in that call?

16  A.  No.

17  Q.  Do you recognize one voice?

18  A.  Yes.

19  Q.  Whose voice is that?

20  A.  Anthony Grecco.

21         MR. SCOTTEN:  No further questions, your Honor.

22         THE COURT:  Cross.

23         MR. McMAHON:  Judge, can I have -- before the jury

24  gives up that transcript, could I have 160 played again?

25         THE COURT:  Yes.

J5NVSEC2                          Anemone - cross

1          (Audio played)

2     CROSS-EXAMINATION

3     BY MR. McMAHON:

4     Q.  Now, beginning on the first page there, Mr. Grecco was

5     saying he's trying to explain why the accounts of all the

6     bettors were suspended because he didn't pay Costa Rica; is

7     that right?

8     A.  On this page that I just read?

9     Q.  Yeah.

10          MR. SCOTTEN:  Objection.  Personal knowledge.

11    Q.  Isn't that what he's telling you?

12          THE COURT:  Please don't argue.

13          I was about to overrule the objection.

14          Now I changed my mind.

15    Q.  And then you heard the conversation switch to, "We'll need

16    50,000."  Did you hear that?

17    A.  Yes, I did.

18    Q.  And it wasn't, "I'll need 50,000," it's, "We'll need

19    50,000."

20    A.  That's correct.

21    Q.  And then the conversation continues.

22          "Forget about them shut off, we ain't shutting out;

23    we're getting ready to close down here."  Did you hear that?

24    A.  Yes, I did.

25    Q.  And the next line --

1            THE COURT:  This is repeating what --

2            MR. McMAHON:  I understand, Judge.  But I think the

3    transcript is in error, and I'd like to have the next line

4    replayed for the jury.

5            THE COURT:  Okay.  Identify the line, page and line

6    number.

7            MR. McMAHON:  Yes, Judge.  Line 19 through 23.

8            THE COURT:  Page?

9            MR. McMAHON:  It's at page 1 of this transcript.

10           THE COURT:  Exhibit 161?

11           MR. McMAHON:  160, your Honor.

12           THE COURT:  160.

13           MR. McMAHON:  Can we have lines 19 to 23 played.

14           (Pause)

15           THE COURT:  What's the problem, folks?

16           MR. SCOTTEN:  Mr. McMahon is requesting that

17    particular lines be played.  There's no way to match that up to

18    seconds, so I'm just trying to help Ms. Brady guess about --

19           THE COURT:  It's one page.  Play the whole thing.

20           (Audio played)

21           MR. McMAHON:  Stop there, Ms. Brady.

22           THE COURT:  Stop.

23    Q.  Now, Mr. Anemone --

24           MR. McMAHON:  Yes.

25           MR. SCOTTEN:  Your Honor, Mr. Anemone has no knowledge

1    of this call.  We'll stipulate that it says "pay."

2                THE COURT:  Just a minute.

3                MR. McMAHON:  Exactly.

4                THE COURT:  I don't understand why there is any need

5    for the two of you to talk together.  You both know the

6    procedure in the courtroom.  You both know that there's no

7    private conversations.  You both know that you ask me when

8    you're going to do that.  Right?

9                MR. SCOTTEN:  Yes, Judge.

10               THE COURT:  Right?

11               MR. McMAHON:  Yes, Judge.

12               And I'll take the blame for this one.

13               MR. SCOTTEN:  Although it's on me too, your Honor.

14               THE COURT:  I don't know that you should take the

15   blame.  I think you're equally blamed.

16               All right.  So what we're talking about, this is a

17   call between -- can I say who it's between?

18               MR. McMAHON:  Yes, it's between Mr. Castelle --

19               THE COURT:  Anthony Grecco and Eugene Castelle.

20               MR. McMAHON:  Yes.

21               THE COURT:  It takes place on October 11, 2012 at 3:01

22   in the afternoon.

23               MR. McMAHON:  Yes, Judge.

24               THE COURT:  All right.

25               MR. McMAHON:  And the parties are in agreement that

1    one word has to be modified on the transcript, and it's in line

2    19.  And instead of, as the transcript says, "We didn't take

3    guys in two weeks," it should read, "We didn't pay guys in two

4    weeks."

5            THE COURT:  Is that right, Mr. Anemone?

6            THE WITNESS:  That makes sense to me.

7            I couldn't figure out what that means.

8            THE COURT:  Excuse me.  Stop.  Stop.

9            You're not on this call.

10           THE WITNESS:  No, but I'm saying you want me to read

11   it.

12           MR. SCOTTEN:  If I may, your Honor.  That is why I was

13   offering to stipulate, because Mr. Anemone can't play a role.

14   But I do think defense counsel has it right.

15           THE COURT:  I understand.  The judge is at fault.

16           So it should be, "We didn't pay guys in two weeks."

17           MR. McMAHON:  Correct.

18           THE COURT:  Okay.

19           MR. McMAHON:  And your Honor, if we could, if the

20   jurors still have transcript 161, it's between the witness and

21   Mr. Grecco.

22           (Audio played)

23           THE COURT:  Stop.  Stop.  Say it again.

24           MR. McMAHON:  I don't need it to be played, I just

25   wanted to ask the witness some questions about it.

J5NVSEC2                         Anemone - cross

1          THE COURT:  Okay.

2          So for my benefit, since I don't have glasses --

3          THE WITNESS:  Here you go, your Honor.

4          THE COURT:  I like to go blind.

5          So this is a call on October 11, 2012 at 4:30 in the

6     afternoon between Mr. Grecco and Mr. Anemone.

7          MR. McMAHON:  Yes, your Honor.

8          THE COURT:  And you're referring to page?

9          MR. McMAHON:  The first page of the transcript.

10    Q.  You were asking him about --

11         THE COURT:  Page 1, line?

12         MR. McMAHON:  Line 22.

13    Q.  You're asking him about Mr. A or your cousin.

14         Now, when you're referring to your cousin, who are you

15    talking about?

16    A.  Never met his cousin.

17    Q.  But do you know what his name is?

18    A.  I do not.

19    Q.  Have you heard the name "Andre Mormile"?

20         THE COURT:  Stop.  Stop.  He didn't know.

21    Q.  You don't know any of Grecco's cousins?

22    A.  No, I do not.

23    Q.  And then on the next page of the transcript, he tells

24    you -- after you discuss the accounts being suspended, he tells

25    you, "He asked me for 50 grand.  Imagine that."

J5NVSEC2                      Anemone - cross

1              Do you recall that part of the conversation?

2              THE COURT:  What line?

3              MR. McMAHON:  Lines 23 and 24.

4    A.  Yes.

5    Q.  Now, you, of course, did not hear the previous call when

6    you had this conversation?

7    A.  No, I did not.

8    Q.  So you didn't know that the 50 grand was the payroll for

9    the construction company?

10   A.  No, I didn't.

11             THE COURT:  Just a minute.

12             That question is objectionable.

13             I sustain the objection, if it was made; and if it

14   isn't made, I do it myself.

15             Go ahead.

16   BY MR. McMAHON:

17   Q.  Mr. Anemone, you testified earlier that you lied to and you

18   tried to cheat -- and did, in fact, cheat -- Anthony Grecco.

19   A.  Yes, I did.

20   Q.  Do you routinely lie, sir?

21   A.  No, I do not.

22   Q.  Did you consider Anthony Grecco a friend?

23   A.  Yes, I do.

24   Q.  And but as soon as you started -- involved in a sports

25   betting relationship with him, you were trying to cheat him and

J5NVSEC2                        Anemone – cross

1    you did cheat him?

2    A.  Yes, I did.

3    Q.  You beat him out of money?

4    A.  Yes, I did.

5    Q.  And is that how you normally conduct business relationships

6    with friends?

7    A.  No, I do not.

8    Q.  When was the last time you saw Mr. Grecco?

9    A.  I would say maybe April of 2016.

10   Q.  When was the last time you talked to Mr. Grecco?

11   A.  Same thing, April of 2016.

12   Q.  Now, you were arrested in April of 2016?

13   A.  Yes, April or May.

14   Q.  And you pled guilty to a felony?

15   A.  Yes, I did.

16   Q.  And as you sit here today, you still have a felony

17   conviction?

18   A.  Yes, I do.

19          THE COURT:  It doesn't disappear.

20          MR. McMAHON:  Pardon me?

21          THE COURT:  It doesn't disappear.

22   Q.  Now, you're a school bus driver; is that right?

23   A.  That is correct.

24   Q.  For a public or for a --

25   A.  Private firm.

J5NVSEC2                    Anemone - cross

1   Q.  Private firm?

2   A.  Private.

3   Q.  Is it in the city here?

4   A.  Yes, it is.

5   Q.  And do they know you have a felony conviction?

6   A.  Not sure.

7   Q.  What are the ages of the kids that you drive?

8          MR. SCOTTEN:  Objection.

9          THE COURT:  Sustained.

10  Q.  Now, before you got in the sports gambling business, you

11  worked for Charles Schwab, stock trade?

12  A.  Yes, I traded for myself.  I didn't work with Charles

13  Schwab, I used Charles Schwab's program to trade stock.

14  Q.  And you did that for a living for a while?

15  A.  Yes, I did.

16  Q.  So you are fairly conversant with computers?

17  A.  I won't say exactly that, but I was able to trade with the

18  computer.

19  Q.  And was this what we call day trading?

20  A.  Yes, it was exactly called that.

21  Q.  And what were the dollar amounts that you would do on an

22  average daily basis?

23  A.  10,000, 15,000.

24  Q.  What kind of salary were you making at the time that you

25  were doing this day trading?

1           MR. SCOTTEN:  Objection.  Relevance.

2           THE COURT:  Just a minute.  Sustained.

3   Q.  Where were you getting the money to do the day trading?

4   A.  I borrowed money.  I'm trying to think where I borrowed the

5   money.  I opened an account with something like 25,000

6   originally, and they gave you like -- you were able to play

7   more.  They gave you like -- I forget the word, because I

8   haven't done it in a while.  You put up this, they'll put up 25

9   too.  I might have borrowed it from my -- probably from my

10  wife's -- she's a school teacher, if I recall.  I think it was

11  that.

12  Q.  Was it from a bank?

13  A.  No.

14  Q.  Was it from the street?

15  A.  No.

16  Q.  Now, one of the calls was in reference to -- you said that

17  there was a time when you had a thing?

18  A.  Yes.

19  Q.  Did you have a loan-shark problem?

20  A.  No.

21  Q.  Now, your phony accounts with Mr. Grecco, that went on for

22  about a year?

23  A.  Maybe a little longer.

24  Q.  How much money do you figure you beat him out of?

25  A.  10,000.

J5NVSEC2                         Anemone – cross

1    Q.   Now, you never -- you had never heard of the name

2    "Boobsie"?

3    A.   No, I did not.

4    Q.   You had never heard the name "Eugene Castelle"?

5    A.   No, I did not.

6    Q.   And so you went and did some research on the Internet?

7    A.   You want me to elaborate a little bit?

8    Q.   No, I just want to know yes or no.

9    A.   Yes.

10            THE COURT:   Do those names come up, either one, in the

11   telephone conversations?

12            THE WITNESS:   The name Boobsie?

13            THE COURT:   Boobsie.

14            THE WITNESS:   No, not in the conversation --

15            THE COURT:   Neither one.

16            THE WITNESS:   On these, no.

17            THE COURT:   Neither one.

18   Q.   So you didn't get the names from Mr. Grecco.  So you were

19   doing a little investigation of your own?

20            MR. SCOTTEN:   Objection.

21            Mischaracterizing testimony.

22            He did say he got them from Grecco.

23            MR. McMAHON:   Judge, I object.

24            This is a speaking objection.

25            THE COURT:   Just a minute.

J5NVSEC2                         Anemone - cross

1            I understand, Mr. Scotten.

2            MR. SCOTTEN:  You're correct, your Honor.  I'm not

3    used to the Court's rules, and I apologize.

4            THE COURT:  You are used -- every judge has the same

5    rules.  There are no speaking objections in this courtroom or

6    in this courthouse.

7            I was going to sustain the objection, but now I won't.

8            MR. McMAHON:  You may answer.

9            THE COURT:  You may answer.

10   A.  Can you repeat the question?

11   Q.  I have now forgotten the question.

12           THE COURT:  Maybe you should go on to the next

13   question.

14           MR. McMAHON:  All right, Judge.  That's fair enough.

15   BY MR. McMAHON:

16   Q.  Oh, no, you like to do research on the Internet, right?

17   A.  I like to do research on the Internet?

18   Q.  Yeah.

19   A.  No.

20   Q.  Are you an organized crime buff?

21   A.  I would say more yes than no.

22   Q.  You read *Gangland*?

23   A.  Yes, I do.

24           THE COURT:  Don't go there.

25   Q.  All right.

J5NVSEC2                        Anemone – cross

1              Now, so you know what a loan shark is?

2    A.  Yes, I do.

3    Q.  And tell the jury what is a loan shark?

4    A.  A person who lends money with pretty high interest.

5    Q.  And interest could be as high as 100, 200 percent?

6    A.  I guess so.

7    Q.  And they collect the money by threats of violence?

8    A.  I guess in some cases.

9    Q.  Now, you, in fact, made a phone call to somebody

10   threatening violence to collect a debt, did you not?

11   A.  Yes.

12   Q.  And that call happened to be taped?

13   A.  Yes.

14   Q.  So you got a little bit of a jackpot?

15   A.  Yes.

16   Q.  Ever hit anybody with a baseball bat?

17   A.  No.

18   Q.  Now, you hope, as part of your agreement with the Kings

19   County District Attorney's Office, that they will replace your

20   felony conviction with a misdemeanor; is that correct?

21   A.  That is correct.

22   Q.  And when did you take the plea?

23   A.  I'm not exactly sure.

24   Q.  Like three years ago?

25   A.  Oh, yeah.

1    Q.  So they are sort of waiting to see how your cooperation

2    works out here with the feds, are they?

3              THE COURT:  Do you know?

4              THE WITNESS:  What was that, your Honor?

5              THE COURT:  Do you know what the Brooklyn DA is doing?

6              THE WITNESS:  My lawyer says yes.

7    Q.  So if you get a clean bill of health from the prosecutors

8    here, then your felony becomes a misdemeanor?

9    A.  I assume so.

10   Q.  And you'd like a misdemeanor instead of a felony?

11   A.  Correct.

12   Q.  By the way, in all the gambling that you've done over the

13   years, you never paid any taxes on your winnings, have you?

14   A.  Yes, I have.

15   Q.  Oh, when was that?

16   A.  When I do my taxes.  I paid on horses.  I have an account,

17   TDG, legal account.

18   Q.  Do you remember meeting with government prosecutors and

19   agents on January 30th, 2019?

20   A.  Do I remember.

21   Q.  Yes.  Having a meeting --

22   A.  Yes, I guess.

23   Q.  And do you remember telling those prosecutors and agents

24   that you did not pay taxes on your gambling winnings?

25   A.  Well, there's two kinds of gambling winnings.  There's

J5NVSEC2                          Anemone – cross

1  horse, which you bet with the state; and then there's gambling

2  you bet with Internet or bookmakers.  The bookmakers,

3  definitely not; the state, yes.

4  Q.  So when I asked you the question, Do you pay taxes, you

5  said yes --

6         THE COURT:  It is what it is.  It is what it is.

7  A.  Right.

8  Q.  How many meetings have you had with the prosecutors?

9  A.  Four or five.

10 Q.  How long did they last?

11 A.  An average?  An hour and-a-half to two.

12 Q.  So that's about eight to ten hours of sitting down being

13 asked every question in their office that you were asked in

14 court?

15 A.  I'm not exactly sure if it's every question.

16 Q.  There weren't any surprise questions, were there?

17 A.  Not that I recall.

18 Q.  And they had -- they played calls for you and you went over

19 what you were going to testify about those calls; is that

20 right?

21 A.  Yes, they did.

22 Q.  Do you know the names of any of the individuals that you

23 met with?

24 A.  Yes, I do.

25 Q.  Was Agent Carillo there?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J5NVSEC2                        Anemone – cross

1    A.  First name do you have?

2    Q.  John.

3    A.  Yes.  Well, I know his first name is John.  You know, I

4    don't know if his last name is that.

5    Q.  Fair enough.

6            Now, did you say that -- I don't remember.

7            Did you say that you didn't know the name of

8    Mr. Grecco's cousins?

9    A.  Yes, I did.  Do not know.

10   Q.  All right.  Well, do you remember having an interview in

11   the Brooklyn District Attorney's Office on April 13, 2016,

12   3503-008, in which you talked to the investigators that day

13   about Mr. Grecco's cousins by name?

14   A.  I do not remember that, because I do not know his name.

15           MR. McMAHON:  If I may approach the witness, your

16   Honor.

17           THE COURT:  You may.

18           So Mr. Anemone, when you are being given a document,

19   you ask yourself, Does this refresh my recollection?  So the

20   answer is either yes or no.  And if it's yes, you can now give

21   your recollection that was refreshed.  Don't read what's in the

22   document.

23           THE WITNESS:  Don't read what's in the document?

24           THE COURT:  You read it to yourself.

25           THE WITNESS:  Oh, I'm saying, yes.

```
 1              THE COURT:  But not out loud.

 2              MR. SCOTTEN:  Your Honor, can I confer briefly with

 3    co-counsel while he reads?

 4              THE COURT:  Yes.  Off the record.

 5              (Counsel conferred)

 6              (Pause)

 7    BY MR. McMAHON:

 8    Q.  Does that refresh your recollection, sir?

 9    A.  There is no way this was said by me.  Never heard of these

10    two people.  I have no idea where this came from.

11    Q.  Do you remember being -- well, you were arrested in April

12    or May of 2016?

13    A.  That is correct.

14    Q.  And you immediately decided to cooperate?

15    A.  I'm not exactly sure.

16    Q.  Well, certainly within 20 or 30 days?

17    A.  I wasn't arrested when they came to my house.  I turned

18    myself in, so I'm trying to -- is that what you're asking me?

19              THE COURT:  No.  He's asking you whether you agreed to

20    cooperate --

21              THE WITNESS:  Later on.

22              THE COURT:  -- signing an agreement.

23    A.  Yes, later on I did, yes.  I don't know exact time.

24    Q.  But you were -- they came to your house and they said, We

25    want to talk to you, detectives did.
```

1    A.  What I remember, believe it or not, I was going to work

2    with my wife.  And they said, You can go to work.  You're not

3    arrested.  We'll get in touch with you.

4            And I says, I'm going to leave you in my house?

5            And they says, You can.

6            And I says, Well, my wife will go.  I'll stay.

7    Q.  Did you talk to detectives?

8    A.  In my house?

9    Q.  I don't know where, if it was your office, your house.

10   A.  Later on, yes.

11   Q.  All right.

12           Later on in your house you talked to detectives?

13   A.  No, I did not, not in my house.

14   Q.  Where did you talk to them?

15   A.  When I went to turn myself in.

16   Q.  Okay.  You did not talk to them before then?

17   A.  No, I did not.

18   Q.  Did you turn yourself in on April 13, 2016?

19   A.  How many days is that after they came to my house?  That's

20   how I can recall.

21   Q.  Withdrawn.

22           On April 1st, 2016, at 11:05 a.m., were you present in

23   the 17th floor conference room in the Kings County District

24   Attorney's Office?

25   A.  I would have to say yes.  You're reading it.

J5NVSEC2                    Anemone – cross

1   Q.  Do you know a Detective Brad Miller?

2   A.  The name rings a bell.

3   Q.  Now, assuming you were in the conference room at the Kings

4   County DA's office, they were talking to you about Grecco's

5   gambling operation, weren't they?

6   A.  Yes, we were.

7   Q.  And you were telling them what you knew about it; is that

8   correct?

9   A.  Yes, I did.

10  Q.  And do you remember telling the Brooklyn DA's Brad Miller

11  that Tony said he would meet Boobsie at construction sites?

12  A.  Yes, he did.

13  Q.  And do you remember telling the Brooklyn DA and Brad Miller

14  that Tony spoke to him about his cousins Vinny and Carl

15  Mormile?

16  A.  No, not one word of that is true.

17  Q.  And do you remember telling the Brooklyn DA and Detective

18  Brad Miller that you looked up Boobsie on the Internet?

19  A.  Yes, I did.

20  Q.  But you didn't mention the Mormiles?

21  A.  I didn't mention the what?

22  Q.  Mormiles.

23  A.  Mormiles?

24  Q.  Yes, Vincent and Carl.

25  A.  I have no idea who these people are, where these names came

J5NVSEC2                          Anemone – cross

1   from.

2            MR. McMAHON:  May I show the witness a picture, your

3   Honor?

4            Showing the witness Government Exhibit 8.

5   Q.  Do you recognize this picture?

6   A.  No, I do not.

7   Q.  Never seen it before?

8   A.  Never seen it.

9   Q.  When you met with the prosecutors, the eight or ten hours

10  that you did, did you have an attorney present?

11  A.  Yes, I did.

12  Q.  And is that attorney in the courtroom?

13  A.  No, he's not.

14  Q.  Now, your business dealings with Mr. Grecco, he would give

15  you back 20 percent of the losses, his winnings?

16  A.  Or more.

17  Q.  Or more.  You got more, sometimes more than 20 percent?

18  A.  Yes, I did.

19  Q.  This is the commission?

20  A.  Yes, it was.

21  Q.  So whatever bettors that you referred, if those bettors

22  lost, then you'd get 20 percent of Grecco's profit, 20 or more?

23  A.  20 percent of my players' losses, yes.

24  Q.  And would you get paid on that weekly, monthly?

25  A.  Weekly.

J5NVSEC2                          Anemone – cross

1    Q.  And I assume he paid you in cash?

2    A.  Cash was paid.

3    Q.  Is that a kind of a standard figure in the world of sports

4    gambling?

5    A.  What?

6    Q.  20 to 25 percent?

7    A.  Unheard of.

8    Q.  You mean it's high?

9    A.  It's unheard of, with no red.

10   Q.  So Grecco was a generous bookie?

11   A.  Very.

12   Q.  So you made a lot of money off of him?

13   A.  I made 10, 12,000, because I wasn't allowed to bet high

14   numbers.

15   Q.  Ten or 12,000 a week?

16   A.  Year, one year.

17   Q.  One year.  You totalled it up?

18   A.  Well, you asked me a question.  I tried to figure out an

19   average week.  It was about two, 250 a week.

20   Q.  How many bettors -- real bettors, as opposed to fake

21   bettors -- did you have?

22   A.  I had -- football season I had about seven.

23   Q.  And it was only $250 a week?

24   A.  No.  You asked for the fake ones.  That was your question,

25   wasn't it?

J5NVSEC2                          Anemone - cross

 1   Q.  No, no, no.  How many --

 2   A.  Oh, the total?

 3   Q.  Yeah, how much did you make a week?

 4   A.  For the year?  That's the best way to do it.  During the

 5   football season, I would say I made 15 -- 10 to 15,000 for the

 6   football season.

 7           THE COURT:  That's what, a week?

 8           THE WITNESS:  No, for the season, football season.

 9   Q.  And you declared that on your tax returns?

10   A.  No, I did not.

11   Q.  Has the government mentioned that you should amend your tax

12   returns and pay the tax you owe?

13   A.  No, they did not.

14           THE COURT:  What's the most popular sport that

15   gambling takes place in?

16           THE WITNESS:  Football.

17           THE COURT:  And what's next?

18           THE WITNESS:  Baseball.

19           MR. McMAHON:  Continue, Judge?

20           THE COURT:  Just curious.

21   BY MR. McMAHON:

22   Q.  Now, did Mr. Grecco tell you that he was introduced to a

23   fellow that you think is Boobsie by his cousin?

24   A.  Yes.

25   Q.  And did you testify in the grand jury that this was the

J5NVSEC2

1   cousin who had passed away?

2   A.  Yes.

3   Q.  You knew he had a cousin who died of cancer?

4   A.  Yes, he told me.

5   Q.  And that was someone recently?  The last few years?

6   A.  I think so.  I think he said it was his godfather.

7   Q.  Yes, that call, remember that call.

8           Now, you heard on some of these calls where Mr. Grecco

9   expressed frustration, to put it mildly, at having to give

10  money to Boobsie.  Do you remember saying that -- testifying

11  that nobody likes to give money away?

12  A.  Yes.

13  Q.  Including Mr. Grecco?

14  A.  Yes.

15  Q.  Including Mr. Anemone?

16  A.  Yes.

17          MR. McMAHON:  Nothing further, your Honor.

18          THE COURT:  Redirect?

19          MR. SCOTTEN:  Nothing further, your Honor.

20          THE COURT:  Thank you, Mr. Anemone.  You're excused.

21          (Witness excused)

22          THE COURT:  Should we break for lunch?

23          MR. SCOTTEN:  Yes, Judge.

24          THE COURT:  Members of the jury, close up your books,

25  give them to Ms. Jones on your way out.  Don't discuss the

J5NVSEC2

1    case.  See you at 2:15.

2              (Jury not present)

3              THE COURT:  Be seated.

4              Do you want to say anything about this article that

5    you gave me this morning?  Mr. Scotten is referring to an

6    article that appears -- what appears to be a newsletter

7    entitled *Gangland News*.  And it advertises itself as the

8    nation's foremost expert on the American Mafia.  It's dated May

9    23, 2019.  It's an article by Jerry Capeci.  It makes various

10   comments about this case and about a companion case pending

11   before this Court in its White Plains division.

12             What's the problem?

13             MR. SCOTTEN:  So the problem, your Honor, is that, as

14   you know, the discovery in this matter was restricted to be

15   used only to defend the case, not to be disseminated to media.

16             I haven't had a chance to look at the whole article

17   and digest it, but one key fact that is only known to

18   Mr. McMahon is that the witness began debriefing in October of

19   2018, personally by me, which is something you would know from

20   the 3500 and for no other apparent reason.

21             I understand that Mr. McMahon said law enforcement

22   sources might have done that, that's always a theoretical

23   possibility; but, of course, law enforcement sources have known

24   since October of 2018.  The timing here is such that it became

25   a media item only once Mr. McMahon knew about this and not

J5NVSEC2

1   before.

2          THE COURT:  I don't think the coincidence is

3   well-taken.  I see nothing in the article that's really

4   harmful.  It's doubtful anybody on the jury reads this.  And

5   we'll just note it, just mark this as a court exhibit.  I think

6   it's Court Exhibit 3.  I'll mark it.

7          MR. McMAHON:  Three, your Honor?

8          THE COURT:  Yes.  Have a good lunch.

9          (Luncheon recess)

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J5N7CAS3                              Beyer - Direct

1               A F T E R N O O N   S E S S I O N

2                             2:15 p.m.

3               (Jury present)

4               THE COURT:  Good afternoon, everyone.  Please be

5      seated.  The next witness is Mr. Beyer.

6               MR. FIDDELMAN:  The government calls Kevin Beyer.

7       KEVIN BEYER,

8            called as a witness by the government,

9            having been duly sworn, testified as follows:

10     DIRECT EXAMINATION

11     BY MR. FIDDELMAN:

12     Q.  Good afternoon.

13     A.  Good afternoon.

14     Q.  How old are you?

15     A.  52.

16     Q.  What is your educational background?

17     A.  I have a Bachelor's degree.

18     Q.  Where do you currently work?

19     A.  I work at a company called BDO.

20     Q.  What is BDO?

21     A.  BDO is a global accounting firm.  We also offer consulting

22     services as well.

23     Q.  How long have you worked at BDO?

24     A.  A little more than five years.

25               THE COURT:  Is that the former David Birden Company?

J5N7CAS3                         Beyer - Direct

1                THE WITNESS:  I'm sorry?

2                THE COURT:  Is that the former David Birden Company?

3                THE WITNESS:  I'm not sure.

4    Q.  Is that BDO?

5    A.  Correct.

6    Q.  Before BDO, as a general matter where did you work?

7                THE COURT:  It's DBO, isn't it?

8                THE WITNESS:  BDO.

9                THE COURT:  BDO.  My mistake.

10               THE WITNESS:  I'm sorry, what was the question?

11   Q.  Before BDO, where did you work?

12   A.  I worked at another global accounting firm called Grant

13   Thornton.

14   Q.  And what did you do before that?

15   A.  Before that I worked at a smaller boutique accounting firm,

16   and prior to that I was a software engineer at Chrysler.

17   Q.  Focusing on the 2015 to 2016 time period, what was your

18   title at BDO at that time?

19   A.  I was a manager in forensic technology services.

20   Q.  And what were your duties and responsibilities as a manager

21   in the forensics technology services group at BDO?

22   A.  I was responsible for providing analysis of large data sets

23   for our clients, returning data analysis and analytics for

24   those data sets.

25   Q.  You mentioned analytics.  What is analytics?

1    A.  Analytics is providing meaning out of large -- extremely

2    large sets of data.  You've heard big data perhaps.  Analytics

3    allows it to be looked at a very high level and glean

4    information from that data.

5    Q.  Was your company BDO hired by law enforcement to analyze

6    data in this case?

7    A.  Yes, sir.

8    Q.  In general what was the data that you were given to

9    analyze?

10    A.  I was told by Kings County district attorney that this was

11    wagering data from websites, and they had requested that we be

12    able to extract all the information from the websites and put

13    it into a readable format.

14    Q.  So what you were given was downloads or saved images of the

15    websites?

16    A.  Correct, it was folders and files from the website.

17    Q.  I'm showing you what is in evidence as Government Exhibit

18    501.  Do you recognize that?

19    A.  I do.

20    Q.  What is that?

21    A.  That is the contents of the data sets I was given from

22    Kings County district attorney.

23    Q.  And how do you know that?

24    A.  I have initialed it.

25    Q.  So you reviewed the contents of the disk in advance?

1    A.  Correct.

2    Q.  So, what was your assignment with respect to this data?

3    A.  My assignment was to extract the data on all the files

4    within the data sets and place that into a readable format

5    where it could be sorted, aggregated and filtered.

6    Q.  What was each file?

7    A.  Each of the files constituted a wager ticket that had data

8    in it explaining the amount of the wager, the date of the wager

9    and what the wager was for, whether this was won or lost.

10   Q.  And what was the general format that these wager tickets

11   were saved in in the data you were given?

12   A.  Those files are in what's called Microsoft active server

13   pages.  Those are essentially HTML files.  HMTL is hypertext

14   mark-up language.  That's the language of all display pages for

15   websites.  They were in that format.

16   Q.  Just to be clear, do you have a background in computer

17   programming?

18   A.  Yes, sir, I have been working on that for 20 years.

19   Q.  So are these computer programming terms that you're using?

20   A.  Correct.

21   Q.  And so those are the particular types of computer file

22   formats that these files were in.

23   A.  Correct.

24   Q.  Did you look at each wager ticket file individually?

25   A.  I did not.  I took a sampling of the files, and I looked at

1  them to determine the structure of the data that was inside

2  them to be able to write a programatic script.

3  Q.  I will ask you about a programatic script in a moment.  Why

4  didn't you just look at every wager ticket file?

5  A.  There were approximately 50,000 wager tickets.  It would

6  have taken an enormous amount of time to look at each one

7  individually.

8  Q.  So you said instead you used a programatic script?

9  A.  Correct.

10 Q.  What is a programatic script?

11 A.  It's a set of instructions that I tell the computer how to

12 pull what we want it to pull from the files.

13 Q.  So in other words a computer program?

14 A.  Correct.

15 Q.  So you wrote a computer program.  What did you write a

16 computer program to do?

17 A.  I'm sorry, could you repeat the question.

18 Q.  What did your computer program do?

19 A.  The program essentially looks at the data set at the very

20 top and exhaustively goes through all the folders and all the

21 files that exist in the data set, and it pulls that wager

22 ticket information from that file, writes as a row in a

23 spreadsheet.

24 Q.  So the result of your computer program was to create a

25 spreadsheet.

J5N7CAS3                      Beyer - Direct

1    A.  Correct.

2    Q.  And is that -- what program is that spreadsheet used in?

3    A.  Microsoft Excel.

4    Q.  OK.  Do you have an analogy that's helpful for what your

5    program was doing?

6    A.  Yeah, I think if you think of it as a traditional file

7    cabinet, you have several drawers, there are folders, there are

8    files, in this case there was approximately 50,000 files.  What

9    this script does is it opens each drawer and goes through every

10   folder and every file within a folder until it runs out, and

11   then it goes to the next one and does the same thing until it

12   runs out of drawers, folders and files.

13   Q.  So you wrote this computer program and then ran it over the

14   data you were given?

15   A.  Correct.

16   Q.  And this created an Excel spreadsheet?

17   A.  Correct.

18   Q.  After you ran your computer program and had an Excel

19   spreadsheet, did you do anything to double check that your

20   computer program had worked correctly?

21   A.  I did.  I took a sampling of the rows in the spreadsheet,

22   and I compared them against the actual files of the data set to

23   ensure that all the data had been copied correctly and that

24   there were no discrepancies.

25   Q.  Did you find any discrepancies?

J5N7CAS3                          Beyer - Direct

1   A.  No, sir.

2   Q.  I am showing you what has been marked as Government

3   Exhibits 400 and 402 for identification.  Do you recognize

4   that?

5   A.  Yes, sir.

6   Q.  What is that?

7   A.  Those are the spreadsheets I created.

8   Q.  The spreadsheets you created are on that disk?

9   A.  Sorry?

10  Q.  The spreadsheets you created are on that disk?

11  A.  Correct.

12  Q.  And how do you know that?

13  A.  I previously viewed it and initialed it.

14  Q.  And are those spreadsheets fair and accurate depictions of

15  the results of your computer program that you just testified

16  about?

17  A.  Yes, sir.

18          MR. FIDDELMAN:  The government offers Government's

19  Exhibits 400 and 402.

20          MR. MCMAHON:  No objection.

21          THE COURT:  Received.

22          (Government Exhibits 400 and 402 received in evidence)

23  Q.  Why were there two spreadsheets?

24  A.  There were two data sets I was given by Kings County

25  district attorney.

J5N7CAS3                         Beyer - Direct

1    Q.  And what were those two different data sets?

2    A.  One was entitled HOTMA and the other was TNAMA.

3    Q.  Do you know what those are?

4    A.  No.

5         MR. FIDDELMAN:  Ms. Brady, if we could bring up

6    Government Exhibit 402, the first tab of the spreadsheet.

7    Q.  Can you explain generally what we are looking at here,

8    please.

9    A.  Yes.  This is the spreadsheet my program created for the

10   TNAMA data set.

11   Q.  And what does each row here show?

12   A.  Each row represents an individual wager from the data set.

13   Q.  Can you explain each column in this chart, please.

14   A.  Sure.  The first column A is entitled account, and that's

15   the name of the data set.

16        The second is the ticket number, which is a unique

17   identifier for each wager placed.

18        The third column, column C, is the agent.  I'm not

19   sure what that is.

20   Q.  And when you say you're not sure what that is, you mean

21   you're not sure what the information is representing?

22   A.  Correct.

23   Q.  Where did the contents of the agent column come from?

24   A.  The contents from that column was from an HTML file that

25   was an agent report.

J5N7CAS3                          Beyer - Direct

1    Q.  So, in other words, the actual information in the

2    spreadsheet was pulled from the data set you were given.

3    A.  Correct.

4    Q.  OK.  You can continue with the columns, please.

5    A.  Column D is the client column.  This was in the wager

6    tickets identified as a client.

7            The wager type, if it exists, is the type of wager

8    that was placed.

9            Column F, the wager status, was the result of the

10   wager, whether it was won or lost.

11           Column G is the dollar amount of the wager.

12           Column H, to win amount.  It's my understanding it's

13   the amount -- if the wager had won, this is the amount that

14   would be paid.

15           Game date, if it exists, is the date of the actual

16   sporting event that was wagered on.

17           Wager date is the date the actual wager was placed.

18           Column K is risk/win.  This came directly from the

19   wager tickets, as did the rest, but I have no idea what it

20   means.

21           Sport, if it existed, was the sport the wager was

22   placed against.

23           The description is the actual text from what the bet

24   was placed on.

25           Wager time adds the time to the date that the wager

1    was made.

2              And the final column is my column for the

3    identification of the file that the data was pulled from.

4    Q.  And what does -- can you just read the first few words of

5    one of the entries of the source file, what that website is?

6    A.  Stakestake.com.

7    Q.  Thank you.  So, just to be clear, did you write the

8    contents of any of these rows yourself?  Did you come up with

9    any of this?

10   A.  The only thing that is mine is the column O, which is the

11   source file.

12   Q.  And where did everything else come from?

13   A.  Everything else came from within the wager ticket or the

14   HTML report, the agent report.

15   Q.  Can the data in this spreadsheet be sorted according to the

16   different columns?

17   A.  Correct.

18   Q.  And can the data in the spreadsheet be filtered, for

19   example, if we wanted to see only the bets placed by a single

20   bettor account?

21   A.  Yes, sir.

22             MR. FIDDELMAN:  So, for example, Ms. Brady, if we

23   could scroll all the way back to the left, and if we could

24   click on the little arrow next to the client header.

25   Q.  What comes up here?

J5N7CAS3                              Beyer - Direct

1  A.  This is a distinct listing of all the clients that placed

2  wagers from this data set.

3  Q.  So, from your previous review, approximately how many

4  different clients are listed in this TNA data set?

5  A.  I believe there are approximately 35.

6  Q.  And what is the date -- withdrawn.

7          Are the rows in this spreadsheet currently sorted by

8  date.

9  A.  Yes, sir.

10  Q.  What is the date of the first wager listed in this data

11  set?

12  A.  September 1, 2015.

13  Q.  And if we scroll all the way to the bottom, Ms. Brady,

14  please.

15          What is the date of the last wager listed in this data

16  set.

17  A.  March 10, 2016.

18  Q.  And approximately how many wager tickets are contained in

19  this spreadsheet?

20  A.  Can you scroll all the way to the right, please.  28,609.

21  Q.  And if you scroll back to the left, please, what is the

22  total amount wagered that all of these wager tickets add up to?

23  A.  $1,982,908.49.

24          THE COURT:  Over what period of time?

25          MR. FIDDELMAN:  I believe the witness testified

J5N7CAS3                          Beyer - Direct

1    September 1, 2015 to March 10, 2016.

2              Ms. Brady, can we go to the second tab of this

3    spreadsheet, please.

4    Q.  This tab is marked total wagers by date.  What are we

5    looking at here?

6    A.  This is an analysis the Kings County district attorney

7    requested to identify by each date wagers were placed, the

8    total amount of wagers made.

9              Additionally, the shading, the blue shading indicates

10   wages for a given date were in excess of $5,000 for a given

11   date.  If the shading is a brown color it indicates that wagers

12   for that date were less than $5,000.

13   Q.  Just to be clear, why did you delineate which dates had

14   total amounts of greater than 5,000 wagered that day?

15   A.  I was instructed to by the Kings County district attorney.

16   Q.  And are the wager tickets underlying this analysis the same

17   ones you have been testifying about from the first tab of this

18   spreadsheet?

19   A.  Yes, sir.

20   Q.  And what does the data here show regarding how many dates

21   had more than $5,000 wagered on those dates?

22   A.  Can you scroll down, please.  Stop, please.

23   Q.  It may be cut off.  I think that is actually row 167, not

24   67.

25   A.  Thank you.  There are 160 days from the data set that had

J5N7CAS3                         Beyer - Direct

1    wagers in excess of $5,000.

2    Q.  Can we bring up Government Exhibit 400, please.  I'm not

3    going to repeat all of the same questions for this spreadsheet,

4    but in general what is this spreadsheet showing, Government

5    Exhibit 400?

6    A.  This is the spreadsheet my program created for the data set

7    HOTMA.

8    Q.  And if you click the arrow next to the client header in

9    this spreadsheet, approximately how many different client

10   accounts were listed in this data set that you were given?

11          Can we put the down arrow next to the word client,

12   please.

13   A.  Can you please scroll.

14          Approximately 55.

15   Q.  And what's the date of the first wager listed in this

16   spreadsheet?

17   A.  September 1, 2015.

18   Q.  And if we scroll all the way to the bottom, what's the date

19   of the last wager?

20   A.  March 9, 2016.

21   Q.  And approximately how many tickets are there in this data

22   set?

23   A.  Can you scroll all the way to the right, please.

24          35,918.

25   Q.  What is the total amount of money wagered in this time

J5N7CAS3                        Beyer - Direct

1   period in this HOT data set?

2   A.  $11,315,256.99.

3          MR. FIDDELMAN:  Ms. Brady, if we could go to tab two

4   of this spreadsheet, please.

5   Q.  Is this now the same analysis you previously testified

6   about on the other data set?

7   A.  Yes, sir.

8   Q.  So, how many of the dates listed in this data set had

9   wagers in excess of $5,000 total?

10  A.  Could you scroll down, please.

11         All of them had wagers -- all the dates had wagers in

12  excess of $5,000.

13  Q.  Is that 190 rows and change?

14  A.  Yeah, I would say 191.

15         MR. FIDDELMAN:  No further questions, your Honor.

16         THE COURT:  Cross examination?

17         MR. MCMAHON:  No cross, your Honor.

18         THE COURT:  You're excused.

19         THE WITNESS:  I'm sorry?

20         THE COURT:  You're excused.

21         THE WITNESS:  Thank you.

22         (Witness excused)

23         MR. SCOTTEN:  Your Honor, the government calls John

24  Pennisi.

25

J5N7CAS3                     Pennisi - Direct

1    JOHN PENNISI,

2         called as a witness by the government,

3         having been duly sworn, testified as follows:

4              DEPUTY COURT CLERK:  Please be seated.  Please state

5    your full name and spell your last name slowly for the record.

6              THE WITNESS:  John Pennisi, P-e-n-n-i-s-i.

7    DIRECT EXAMINATION

8    BY MR. SCOTTEN:

9    Q.  Mr. Pennisi, how old are you?

10   A.  49.

11   Q.  Where did you grow up?

12   A.  Ozone Park, Queens.

13   Q.  How far did you go in school?

14   A.  12th grade.

15   Q.  Do you work for a living now?

16   A.  Yes.

17   Q.  Very generally speaking, what industry do you work in?

18   A.  Construction.

19   Q.  Mr. Pennisi, were you formally a member of a criminal

20   organization?

21   A.  Yes.

22   Q.  What organization?

23   A.  The Lucchese crime family.

24   Q.  Have you pled guilty to federal charges resulting from your

25   membership in the Lucchese crime family?

J5N7CAS3                          Pennisi - Direct

1   A.  Yes.

2   Q.  I'm going to ask you a bit more about that later.  For now,

3   do you see anyone in the courtroom today who was part of the

4   Lucchese family with you?

5   A.  Yes.

6   Q.  Who do you see?

7   A.  Boobsie.

8   Q.  Can you indicate where Boobsie is sitting and what he's

9   wearing.

10  A.  He's sitting over there.  He is --

11              THE COURT:  Over where?

12              THE WITNESS:  At defense table.

13              THE COURT:  At the defense table.  Let the record

14  reflect that Mr. Pennisi has identified the defendant.

15  Q.  And do you know Boobsie's given name?

16  A.  Yes.

17  Q.  What is it?

18  A.  Eugene Castelle.

19  Q.  How do you know the defendant is a member of the Lucchese

20  family?

21  A.  I was introduced to him.

22  Q.  What does it mean to be introduced?

23  A.  He was introduced to me, and I was introduced to him as

24  members of the family.

25  Q.  Is there a particular way that introduction is conducted?

J5N7CAS3                          Pennisi - Direct

1    A.   Yes.

2    Q.   So how would someone in the Lucchese family have introduced

3    you to the defendant?

4    A.   It would be done by a third member who knows both of us.

5    Q.   And what words were said?

6    A.   They would say, for example, John is amiga nostra with us,

7    and this is Boobsie, amiga nostra with us.

8    Q.   What does the "with us" indicate?

9    A.   With the family.

10   Q.   Which family?

11   A.   Lucchese.

12   Q.   When the defendant was introduced to you, did he hold any

13   position in the family other than made member?

14   A.   No.

15   Q.   Do you know whether he held a position other than made

16   member in the past?

17   A.   Yes.

18   Q.   How do you know that?

19   A.   One of our friends Johnny Sideburns told me.

20   Q.   When you say one of our friends, you just mean a person you

21   knew socially?

22   A.   No, another member.

23   Q.   And what did this other member of the family tell you?

24           THE COURT:   Speak louder, please.

25   A.   Years ago there was a lot of arrests in the family, and he

1    took a position of acting underboss.

2    Q.  To be clear, who was it who took the position of acting

3    underboss?

4    A.  Boobsie.

5    Q.  You said a minute ago the "with us" meant that you were in

6    the same family.  Can members of other families make

7    introductions?

8    A.  Yes.

9    Q.  So, for example, I want to show you what is in evidence as

10   Government Exhibit 13.  Do you recognize this person?

11   A.  Yes.

12   Q.  Do you know his name?

13   A.  Blaise.

14   Q.  Do you know his last name?

15   A.  Corozzo.

16   Q.  And how do you know Blaise Corozzo?

17   A.  I knew him since I'm a kid, but I was also introduced to

18   him.

19   Q.  Does he have an affiliation with organized crime?

20   A.  Yes.

21   Q.  And what is that?

22   A.  He's a Gambino.

23   Q.  So, if you were to introduce -- back when you were in the

24   Lucchese family, if you were to introduce the defendant to

25   Blaise Corozzo, how would you say it?

J5N7CAS3                          Pennisi - Direct

1    A.   I would say, Blaise, this is Boobsie amiga nostra with us.

2    Boobsie, this is Blaise, amiga nostra with the Gambinos.

3             THE COURT:  Mr. Pennisi, you have to speak louder;

4    don't rely on the microphone.

5             THE WITNESS:  OK.

6             THE COURT:  Speak to the clock.

7             THE WITNESS:  OK.

8             MR. SCOTTEN:  I'm going to try to keep my voice up,

9    and if you can do what I'm doing.

10            THE COURT:  Excellent.

11            THE WITNESS:  OK.

12   Q.   What is the purpose of introducing two members to each

13   other?

14   A.   To identify each other.

15   Q.   Once that introduction has been made, does it have any

16   consequences?  What can you do once you have been introduced?

17   A.   We can speak freely to one another about anything to do

18   with organized crime.

19   Q.   I want to know how you got to the point of making these

20   introductions.  When you were growing up in Queens, were you

21   aware of the Mafia?

22   A.   Yes.

23   Q.   How did you become aware of the Mafia?

24   A.   There was a social club on like every other block where I

25   lived.

J5N7CAS3                          Pennisi - Direct

1   Q.  And where exactly did you grow up?

2   A.  I grew up in both Ozone Park and Howard Beach, Queens.

3   Q.  And as a teenager did you eventually become affiliated with

4   any family?

5   A.  Yes.

6   Q.  What family did you become affiliated with when you were a

7   teenager?

8   A.  The Gambino family.

9   Q.  What was your relationship to the Gambino family?

10  A.  I was an associate.

11  Q.  To be clear, did that make you a member of the family?

12  A.  No.

13  Q.  Was there a particular member of the family who you were

14  around?

15  A.  Yes.

16  Q.  Who was that?

17  A.  John Junior.

18          MR. MCMAHON:  I'm sorry, I didn't hear.

19          THE WITNESS:  John Junior.

20          THE COURT:  How do you spell Gione?  Oh, John Junior.

21          THE WITNESS:  Yes.

22  Q.  Who was John Junior's father?

23  A.  John Gotti.

24  Q.  And what was John Junior's full name?

25  A.  John Gotti, Jr.

J5N7CAS3                              Pennisi - Direct

1   Q.  How long were you around the Gambinos on the street?

2   A.  A number of years.

3   Q.  When you were 20 years old, did you go to prison for a

4   serious crime?

5   A.  Yes.

6   Q.  Did you plead guilty or did you go to trial?

7   A.  I went to trial.

8   Q.  Did you testify at trial?

9   A.  I did.

10  Q.  Did you tell the whole truth?

11  A.  I did not.

12  Q.  The lie you told, was it an important one?

13  A.  Yes.

14  Q.  Why did you tell this lie?

15          THE COURT:  You're dropping your voice.

16  Q.  Why did you lie, Mr. Pennisi?

17  A.  To get myself out of trouble.

18  Q.  Did you also have a co-defendant?

19  A.  Yes.

20  Q.  And would that lie you believe help your co-defendant out

21  as well?

22  A.  Yes.

23  Q.  Did the jury convict you?

24  A.  Yes, they did.

25  Q.  When you were in prison, did you stay away from the Mafia?

 1   A.  No.

 2   Q.  Where did you see Mafia guys when you were in prison?

 3   A.  They were in prison with me.

 4   Q.  And were the Mafia members and associates in prison with

 5   you, were they part of a larger group in prison at the time?

 6   A.  Yes.

 7   Q.  What group was that?

 8   A.  Italians.

 9   Q.  And did the Italians in prison always get along with other

10   groups?

11   A.  No.

12   Q.  Were there fights?

13   A.  Yes.

14   Q.  Were you part of those fights?

15   A.  Yes.

16   Q.  Did you ever use a weapon?

17   A.  No.

18   Q.  Did you ever seriously injure somebody?

19   A.  No.

20   Q.  But did you beat people with your fists on many occasions?

21   A.  Yes.

22   Q.  Around what year did you get out of prison?

23   A.  2007.

24   Q.  What did you do when you got out of prison in 2007?

25   A.  I went to work.

1    Q.   What kind of work?

2    A.   Construction.

3    Q.   Where did you live when you were working construction?

4    Generally what neighborhood?

5    A.   Staten Island.

6    Q.   Now, the construction you had in 2007, was it a legitimate

7    job?

8    A.   Yes.

9    Q.   Did you go to work?

10   A.   I went to work.

11   Q.   From 2007 to about --

12          THE COURT:  What did you do?

13          THE WITNESS:  I was a laborer.

14          THE COURT:  You were a laborer.

15          THE WITNESS:   I was a 731 laborer.

16          THE COURT:  731 is what?  Union?

17          THE WITNESS:   Union.

18   Q.   What does that mean you did on a day-to-day basis?

19   A.   We cleaned -- we kind of cleaned up after all the other

20   trades.

21   Q.   And a trade is something more skilled like a carpenter

22   or --

23   A.   A carpenter or an electrician.

24   Q.   So from about 2007 to 2011 were you involved with the

25   Mafia?

J5N7CAS3                          Pennisi - Direct

1    A.  No.

2    Q.  So how did you come to begin associating with the Lucchese

3    family?

4    A.  A friend of mine asked me to start coming to a restaurant

5    that he stood in, and there was a fight there.

6    Q.  What was the name of the restaurant?

7    A.  The Pearl.

8    Q.  The Pearl Room?

9    A.  Yes.

10   Q.  What was the name of the friend?

11   A.  Anthony.

12   Q.  And here when you say friend, you just mean some social

13   acquaintance?

14   A.  He was in prison with me, Anthony, yeah.

15   Q.  And what was the fight over?

16   A.  It was over some people that were in the restaurant, they

17   didn't pay the check.

18   Q.  And did you use any weapons in this fight?

19   A.  I did not.

20   Q.  Did you win the fight?

21   A.  I think so.

22   Q.  And how did this lead to an association with the Lucchese

23   family?

24   A.  Because the two guys that we got into a fight with,

25   according to Anthony, were associated with the Colombo family.

1  Q.  And what does that mean, being associated with the Colombo

2  family, what does that mean?

3  A.  That we were going to have a problem with them.

4  Q.  And based on your fear of the Colombo family, what did you

5  do?

6  A.  I went to go speak to a childhood friend of mine.

7  Q.  Before I ask about the friend, why not just go to the

8  Colombo family?

9  A.  I wasn't able to.

10  Q.  Why not?

11  A.  Because you just can't -- you just can't go -- you can't go

12  to them.  You just can't do it; you can't go to these people.

13  Q.  And to be clear, what was your status in the organized

14  crime world at this time?

15  A.  Nothing.

16  Q.  So, who did you go to?

17  A.  I went to a childhood friend of mine.

18  Q.  What was his name?

19  A.  Joey.

20  Q.  What was Joey's last name?

21  A.  DiBenedetto.

22          THE COURT:  DiBenedetto?

23          THE WITNESS:  DiBenedetto.

24  Q.  Could you spell it for the record?

25  A.  I believe it's capital D-i, capital B-e-n-e-d-e-t-t-o.

J5N7CAS3                              Pennisi - Direct

1    Q.  And why Mr. DiBenedetto, why did you reach out to him?

2    A.  He was a member of the family.

3    Q.  Which family?

4    A.  Lucchese.

5    Q.  And so why reach out to a member of the Lucchese family

6    based on your concerns about the Colombos?

7    A.  He would be able to go and speak to them for me.

8    Q.  Why?

9    A.  Because he was a member.

10   Q.  After you spoke with DiBenedetto, did you in fact have any

11   problems with the Colombos?

12   A.  I did not.

13   Q.  Did reaching out to DiBenedetto have any consequences for

14   you?

15   A.  Yes.

16   Q.  What happened?

17   A.  I started staying with him on a daily basis, and eventually

18   he put me with him.

19   Q.  When you say he put you with him, what does that mean?

20   A.  I was associated to him.  You know, he was a member, and I

21   was associated with him.

22   Q.  Is there another phrase for your status relative to him?

23   A.  I was an associate.

24   Q.  Were you on record with him?

25   A.  I was on record.

J5N7CAS3                            Pennisi - Direct

1   Q.  And did that mean you're just with him, or is there some

2   consequences for a family affiliation as well?

3   A.  I was on record with the family as an associate.

4   Q.  Were there any benefits to being an associate with

5   DiBenedetto and the Lucchese family?

6   A.  Yes.

7   Q.  What were those benefits?

8   A.  Just like the early incident with these guys with the

9   fight, they would now be able to speak for me.

10  Q.  If you needed representation in something like this, did

11  you tell people you were with Joseph DiBenedetto?

12  A.  No.

13  Q.  Why not?

14  A.  Because you just didn't mention somebody's name.

15  Q.  So what would you say?

16  A.  I'm going to speak to my friend.

17  Q.  Did you ever speak with associates around other friends?

18  A.  Yes.

19  Q.  And so if you needed to put an associate in touch with

20  DiBenedetto, or you needed the two made men to speak, how would

21  you say that?

22  A.  You go talk to your friend, I'll talk to mine.

23  Q.  Did you have any obligations as a result of being on record

24  with the Lucchese family?

25  A.  Yes.

J5N7CAS3                          Pennisi - Direct

1    Q.  What were those obligations?

2    A.  If they ever call me, I would have to come, and at

3    Christmastime to give an envelope.

4    Q.  What's in the envelope?

5    A.  Money.

6    Q.  How much money did you give to DiBenedetto?

7    A.  I think it was $500.

8    Q.  Was there a particular time of year?  I think you said but

9    --

10   A.  Christmastime.

11   Q.  When you were an associate around DiBenedetto, were you

12   making a lot of money from crime?

13   A.  No.

14   Q.  If you had more, would you have to give more?

15   A.  There was no -- at that point there was no set number, but

16   maybe I would have gave more.

17           THE COURT:  How do you know how much to give?

18           THE WITNESS:  I didn't.  I didn't.  I just gave -- I

19   never was told I had to give it, but I knew that's what went

20   on, and I just gave it at my free will.

21   Q.  Did anybody question you about the amount you gave?

22   A.  No.

23   Q.  When you were an associate around DiBenedetto, did you

24   learn whether someone was above him in the Lucchese family?

25   A.  Yes.

1   Q.  How did you learn that?

2   A.  He spoke of his captain.

3   Q.  Who was the DiBenedetto's captain?

4   A.  Big John.

5   Q.  Do you know Big John he's full name?

6   A.  Castellucci.

7   Q.  I show what you is in evidence as Government Exhibit 3.  Do

8   you recognize him?

9   A.  That's John.

10  Q.  By the way, is there any connection between John

11  Castellucci and the defendant?

12  A.  It's his brother.

13  Q.  Did the defendant and Castellucci have any other brothers?

14  A.  Yes.

15  Q.  Do you know his name or nickname?

16  A.  Spanky.

17  Q.  Do you know his real name?

18  A.  Anthony Castelle.

19  Q.  At some point in the future did you learn whether Anthony

20  Castelle had any affiliation to organized crime?

21  A.  He was a friend.

22  Q.  During the period when you were an associate, did you

23  engage in any illegal activity?

24  A.  Yes.

25  Q.  What were some of the crimes you committed?

J5N7CAS3                         Pennisi - Direct

1    A.  Sports betting and assault.

2    Q.  Let's start with sports betting.  What kind of gambling

3    operation was it?

4    A.  I was on a half sheet.

5    Q.  When you say you were on a half sheet, can you explain what

6    that means as you understand it.

7    A.  You're kind of partners with the bookie on the sports

8    betting.

9    Q.  How many bettors were you responsible for?

10   A.  Maybe three.

11   Q.  And what's the significance of being on a half sheet?

12   Would that affect your profits?

13   A.  It just means that if the bettor wins, the bookie pays it

14   out and you are in the red for that money.

15   Q.  What does it mean to be in the red?

16   A.  You now owe the money, whereas the following week if

17   somebody won $500, you now are in the red.  And if the

18   following week a bettor lost $2,000, usually your half would be

19   1,000, but your half would now be 500, and 500 would go to pay

20   off the red.

21   Q.  I want to be clear, you're saying your half.  Is that

22   because you're on a half sheet, is that the reason you're

23   getting -- or not getting half?

24   A.  You're getting half of the winnings -- I'm sorry -- half of

25   the losses.

J5N7CAS3                      Pennisi - Direct

1   Q.  You win what the bettors lose; is that correct?

2   A.  Correct.

3   Q.  Was the book maker you were with a made member of the

4   Lucchese family?

5   A.  No.

6   Q.  So how did you end up in business with this book maker?

7   A.  John told me to, you know, get together with him.

8   Q.  Was that Big John Castellucci?

9   A.  Yes.

10          MR. MCMAHON:  Judge, I object to leading.

11          THE COURT:  Overruled.

12  Q.  What role did John Castellucci play in this book making

13  business?

14  A.  He was a partner with the book maker.

15  Q.  What does it mean for him to be a partner?

16  A.  He was like a bank.

17  Q.  So he provided some of the money?

18  A.  Yes.

19  Q.  Other than putting up some money, did John Castellucci add

20  anything else to this business?

21  A.  Protection.  He would protect the business.

22  Q.  What do you mean by that?

23  A.  If somebody tried to shake down the book maker, or rob them

24  or not paying them, you always had John -- you would go to

25  John.

1    Q.  If a bettor hadn't paid you, would you have gone to the

2    police or to the courts to collect?

3    A.  No.

4    Q.  Why not?

5    A.  It was an illegal sports betting operation.

6    Q.  Were you concerned that bettors might not repay you?

7    A.  No.

8    Q.  Why not?

9    A.  Most of them, they knew who we were.

10   Q.  Did you ever have to hurt anyone, tell them you were going

11   to hurt them, in order to collect the debt?

12   A.  No.

13   Q.  Why not?

14   A.  The same, they knew who we were.

15   Q.  I think you said this.  You participated in at least one

16   assault as an associate?

17   A.  Yes.

18   Q.  Is there a specific assault you're thinking of?

19   A.  Yes.

20   Q.  Was it your idea to do this?

21   A.  No.

22   Q.  Who were you acting for?

23   A.  John.  Big John had come to me and told me to do it.

24   Q.  And did John say who, what or why?

25   A.  A drug dealer was selling drugs to his son.

J5N7CAS3                          Pennisi - Direct

1    Q.  And what did John Castellucci say he wanted you to do?

2    A.  He wanted me to smack him in the face and threaten him.

3    Q.  Did you do that?

4    A.  I did.

5    Q.  Did you do it by yourself?

6    A.  No.

7    Q.  Who went with you?

8    A.  Anthony Guzzo.

9    Q.  The same Guzzo from the Pearl Room?

10   A.  Yes.

11   Q.  Was he also an associate at this time?

12   A.  He was.

13   Q.  Did you hurt the victim badly?

14   A.  He was bleeding in the mouth.

15   Q.  Was he scared?  The victim, did you terrify the man?

16   A.  He was scared.

17   Q.  Did you use a weapon?

18   A.  No.

19   Q.  Did you eventually cease being on record with DiBenedetto

20   as an associate?

21   A.  Yes.

22   Q.  What happened?

23   A.  I got straightened out.

24   Q.  What does straightened out mean?

25   A.  Inducted into the family.

1    Q.  When did you become a member of the Lucchese family?

2    A.  April 2, 2013.

3    Q.  Is there a particular way you remember that date?

4    A.  Yes.

5    Q.  How is that?

6    A.  My exwife's birthday was April 2, and so it was on her

7    birthday.

8    Q.  Was there a ceremony?

9    A.  Yes.

10   Q.  Where was the ceremony?

11   A.  At a house in Staten Island.

12   Q.  How did you get there?

13   A.  Spanky drove us.

14   Q.  Anthony Castelle, the defendant's brother?

15   A.  Correct.

16   Q.  Did the ceremony begin as soon as you got there?

17   A.  Excuse me?

18   Q.  Did the ceremony begin as soon as you got to this house?

19   A.  No.

20   Q.  Where did you wait?

21   A.  I waited in the basement.

22   Q.  What room was the ceremony in?

23   A.  It was in -- I believe it was the dining room.

24   Q.  So, when you went into the dining room, was anyone in

25   there?

J5N7CAS3                         Pennisi - Direct

1    A.  Yes.

2    Q.  I'm not going to ask you to name everybody present, but

3    generally speaking what kind of group of people was in the

4    dining room?

5    A.  There was a bunch of guys that were from the -- Luccheses,

6    a bunch of them, members.

7    Q.  What were they doing, this group of people?

8    A.  They were just sitting there quietly.

9    Q.  Were they sitting at a table, or were they sitting in

10   chairs?

11   A.  They were sitting at like a dining room, a long table and

12   chairs.

13   Q.  Was there anything on the table?

14   A.  Yes.

15   Q.  What was on the table?

16   A.  There was a gun, a knife, there was a picture of a saint,

17   an ashtray, a lighter, and like a diabetic pin, needle.

18   Q.  For diabetes?

19   A.  To check your blood, like diabetics check their blood with.

20   Q.  Who presided over your ceremony?

21   A.  Matty.

22   Q.  Do you know Matty's last name?

23   A.  Madonna.

24   Q.  And at the time did you have an understanding of who Matty

25   Madonna was?

1   A.  Yes.

2   Q.  Who was that?

3   A.  He was the acting boss.

4   Q.  So how did the ceremony begin?

5   A.  Matty spoke to me and asked me if I knew why I was there.

6   Q.  What did you say?

7   A.  I said I didn't know.

8   Q.  Was that true?

9   A.  No.

10  Q.  You knew.

11  A.  I knew why I was there.

12          THE COURT:  Were you supposed to say that?

13          THE WITNESS:  Yeah, you're not supposed to say you

14  know why you're there.

15          THE COURT:  Did somebody give you a drill before you

16  went there?

17          THE WITNESS:  I just learned this.  I don't know how I

18  knew.

19          THE COURT:  You picked it up off the street.

20          THE WITNESS:  Yes, and you're not supposed to say --

21          THE COURT:  Street knowledge.

22          THE WITNESS:  It's a secret organization, so you're

23  not supposed to know why you're there.

24          THE COURT:  But you learned about this through like

25  street knowledge; no one told you.

1          THE WITNESS:  No one told me.

2   Q.  After you said you didn't know, did Madonna respond with

3   anything?

4   A.  He --

5          THE COURT:  What went on?  How did it go step by step?

6          THE WITNESS:  So, he -- I said, no, I did not know why

7   I was there.  And he said that I was there to be considered

8   being inducted into the family, that they were the Lucchese

9   crime family, and would I like to become a member of this

10  family.  And I said yes.  And he then asked me what is my

11  trigger finger, and I showed him my right hand, and Big John

12  was sitting next to me, and he took the diabetic needle and

13  poked my finger, and they took the saint, and they poured blood

14  drops onto the saint, and then he said to me we're going to

15  light the saint on fire, and you're going to put your hands out

16  and you're going to move the paper of the saint back and forth

17  in your hands and repeat after me.  So, they lit the saint on

18  fire, and I moved it back and forth while it was on fire, and I

19  repeated after Matty, and he said if I was ever to betray any

20  member of the family, that my soul would burn like the saint is

21  burning.  And then it was done.

22  Q.  After that, was there further sort of a concluding part of

23  the ceremony?

24  A.  Yes.

25  Q.  What happened then?

J5N7CAS3                          Pennisi - Direct

A.  He started to explain the rules of that life to me.

Q.  What are some of the rules you remember him explaining?

A.  One is that you don't put your hand on any other member in that family or any family.

Q.  Continue.

A.  And he had said to me that, however, if a member puts his hands on you, kill that member and we'll deal with it later.

     He also explained to me that I was not to have anything to do with another member's wife or girlfriend.  That was a no-no.

     He explained to me that I was not to deal in any drugs.  And that if my child was in the hospital dying and anyone from the family called me, I was to leave my dying child and go to the family.

Q.  Did Madonna say anything to you about money, earning or obligations?

A.  Yes.  He said we're not here to shake you down; that's not what we're about.  He says, for instance, if you own a business, that business is your business, that's not our business; of course it's protected by the family.  But anything that you made on the strength of this, you would kick up to the family, the administration.

Q.  And if the record could show when the witness said "on the strength of this" he grabbed the area of his breast pocket.

A.  Correct.

1   Q.  What did that symbolize?  What do you mean by the strength

2   of this?

3   A.  It symbolizes a button.

4   Q.  What's a button?

5   A.  It comes from years ago when a member of the family, they

6   used to call them button men, if a boss wanted to kill somebody

7   he says he presses a button and sends a made member to do it,

8   he presses a button.  It's an old way of calling a member,

9   button.

10  Q.  After Madonna explained the rules, what was sort of the

11  next thing that happened that day?

12  A.  Introduction around the whole table.

13  Q.  You were introduced to everyone there?

14  A.  Yes.

15  Q.  What was the first introduction you made?

16  A.  It was Joe DiNapoli introducing me to Matty.

17  Q.  What did Joe DiNapoli say, the best you remember?

18  A.  He asked me, do you know who this is?  And I said no.

19  Q.  And again is that actually true?  Did you know who Madonna

20  was?

21  A.  I did know.

22  Q.  Same rule as before?

23  A.  Yes, I can't say that I know who he is.

24  Q.  And what did DiNapoli say?

25  A.  He said this is your acting boss.  And then Matty in turn

1    said, do you know who this is about Joe?  And I of course said

2    the same thing, no, for the same reason.  And he said this is

3    your official consigliere.  That was the only two -- there are

4    three people that are the administration.  The third person was

5    not there.

6    Q.  Was he discussed?

7    A.  Yes.

8    Q.  Who talked about him?

9    A.  It was Joe DiNapoli said and Stevie Crea is your official

10   underboss, even though he was absent.

11              THE COURT:  Your official what?

12              THE WITNESS:  Underboss.

13   Q.  So were you introduced to everyone present at the ceremony?

14   A.  Yes.

15   Q.  You said earlier that you were introduced to the defendant.

16   Was the defendant at your ceremony?

17   A.  He was not.

18   Q.  So are there introductions after the ceremony too?

19   A.  Yes.

20   Q.  When can there be an introduction?

21   A.  Whenever you're in the company of someone that you didn't

22   meet in the family, a member would do the introduction.

23   Q.  Do you remember where you were when you were introduced to

24   the defendant?

25   A.  Yes.

J5N7CAS3                          Pennisi - Direct

1   Q.  Where?

2   A.  I was at his brother's cigar lounge.

3          MR. SCOTTEN:  Can we please show what is in evidence

4   as 239.

5   Q.  Mr. Pennisi, do you see the cigar lounge here?

6   A.  Yes.

7   Q.  Can you kind of describe where in the picture it is.

8   A.  It's the shorter of these two buildings.  One says Cabo on

9   the left, and the other one is just another red brick building.

10         THE COURT:  Let the record reflect that the cigar

11  place was identified.

12  Q.  Between say 2012 and 2017, how often were you at the Cigar

13  Vault?

14  A.  All the time.

15  Q.  And you said you saw the defendant there once.  How often

16  did you see him there?

17  A.  All the time.

18  Q.  Did anything happen at the Cigar Vault other than selling

19  cigars?

20  A.  Yeah, there was plenty of --

21         THE COURT:  Plenty of what?

22  A.  Members from our crew, other families, associates, regular

23  people that were in there buying cigars; we used to meet in

24  there.

25  Q.  You said you used to meet in there.  Did you discuss family

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    business in the Cigar Vault?

2    A.  No.

3    Q.  Why not?

4    A.  We were worried about bugs by the F.B.I.

5             THE COURT:  Did you smoke there too?

6             THE WITNESS:  Yeah, regular people could go and smoke

7    cigars there too.  It was open to the public.

8             THE COURT:  So if you go in there and you buy a cigar,

9    you just hang around and sit there and have a drink?

10            THE WITNESS:  Not a drink, but you could go and

11   anybody could walk in and go sit in the back.  We usually stood

12   in front.  And regular people were there buying cigars.

13            THE COURT:  So say it's somewhat of a social club as

14   well as a place to buy cigars.

15            THE WITNESS:  Yeah, it's a cigar lounge, more like a

16   lounge, a lot of TVs.  They watched sports and what not.

17   Q.  When you did want to do business if you were at the Cigar

18   Vault, what would you do?

19   A.  We would go outside, and we would take our phones and put

20   it like on the counter, and we would go outside and talk.

21   Q.  Why leave the phone?

22   A.  Because we felt that the F.B.I. maybe could listen in on

23   the phone if it was on open mic or something, and we just were

24   leery of having the phones with us when we were talking.

25   Q.  On this picture, do you see a restaurant on the far right?

J5N7CAS3                          Pennisi - Direct

1    A.   Yes.

2    Q.   Do you know the name of that restaurant?

3    A.   Zio Toto.

4    Q.   Have you been there before?

5    A.   Yes.

6    Q.   How often?

7    A.   A lot, been there a lot.

8    Q.   Do you see anyone in the room that you have been there

9    with?

10   A.   Boobsie.

11           THE COURT:  Slow your question and speak louder.  Your

12   voice tends to drop at the end of the sentence.  It's hard for

13   me to understand your sentence all the time, and I think if you

14   speak louder and slower, maybe Mr. Pennisi will remember to

15   speak to the clock and we can get better testimony.

16           THE WITNESS:  I apologize.

17           MR. SCOTTEN:  Thank you, Judge.

18           THE COURT:  And maybe the jury doesn't need this but

19   the judge dos.

20           MR. SCOTTEN:  It couldn't hurt.  I keep looking down

21   to read the questions.

22   Q.   Mr. Pennisi, have you ever seen the defendant in Zio Toto?

23   A.   Yes.

24   Q.   How often?

25   A.   Quite often.  I used to see him a lot.

J5N7CAS3                            Pennisi - Direct

1   Q.  Have you ever been to Zio Toto for an official function?

2   A.  Yes.

3   Q.  What was the function?

4   A.  We had our yearly Christmas party there.

5   Q.  And when you say we had our party, who had the party?

6   A.  Our crew that we were with.

7   Q.  And we haven't talked about the crew yet, have we?

8   A.  No.

9   Q.  So just for now who is the captain of the crew?

10  A.  Big John.

11          THE COURT:  What's your crew made up of?

12          THE WITNESS:  Members of a certain faction.  We were

13  the Brooklyn faction of the Lucchese family, but we operated

14  out of Staten Island.

15          THE COURT:  And how many were there in the crew?

16          THE WITNESS:  It changed at times because we would --

17          THE COURT:  Don't be exact but approximately.

18          THE WITNESS:  Maybe seven, seven or eight of us.

19          THE COURT:  Was there somebody in charge?

20          THE WITNESS:  A captain is in charge.

21          THE COURT:  A captain was in charge?

22          THE WITNESS:  He is the head of the crew.

23          THE COURT:  And were there ranks among the other six?

24          THE WITNESS:  We were all members of the family.

25          THE COURT:  Equal.

J5N7CAS3                          Pennisi - Direct

1    THE WITNESS:  Yes, the rest of us under the captain

2   were equal.  We were a family within a family, meaning a small

3   family within a larger family, but the crews operated as a

4   small family headed by a captain, which would be the head of

5   that small family, crew.

6   Q.  And just to complete that kind of area, do you have a sense

7   of how many other crews were out there?  Or did you know of

8   other crews?

9   A.  Yes.

10  Q.  Within the Lucchese family, what are some of the other

11  crews you can remember?

12  A.  You had two crews in the Bronx.  You had two on Long

13  Island.  You had Manhattan.  Staten Island was us.  And you had

14  New Jersey.

15          THE COURT:  You had Brooklyn and Staten Island?

16          THE WITNESS:  We were considered the Brooklyn crew,

17  but we just operated out of Staten Island.  There was no real

18  Staten Island crew.  Although we were in Staten Island, we were

19  the Brooklyn part of that family.

20  Q.  And to be clear, if you live on Staten Island why are you

21  considered Brooklyn?

22  A.  Excuse me?

23  Q.  Were you from Brooklyn?

24          THE COURT:  Because everybody from Staten Island came

25  from Brooklyn.

1          THE WITNESS:  Yeah.  You could live in Long Island.  I

2     was living in Long Island at the time and traveling to Staten

3     Island.  It's just wherever they put you.  It doesn't mean that

4     you have to come from Brooklyn.

5     Q.  So you said you were going to Zio Toto for your crew's

6     Christmas parties?

7     A.  Correct.

8     Q.  Did you have to make any payments around Christmas?

9     A.  Yes, I did.

10    Q.  How much did you pay?

11    A.  Well, I was supposed to pay 2500.

12    Q.  And why are you saying supposed to pay?  How much did you

13    pay?

14    A.  Because Big John was breaking one of our rules by trying to

15    shake members down, and he put a $6,000 price tag at

16    Christmastime.  I never paid him that.

17    Q.  What do you think you actually paid him?

18    A.  I sometimes paid him $3,000, 3500, but I never paid him

19    what he wanted.

20    Q.  And you said you were paying this to Big John?

21    A.  It was going to John.  Sometimes I would give it to Johnny

22    Sideburns, and he would ultimately give it to John.  Sometimes

23    I handed it to John.  It was always in an envelope.

24          THE COURT:  Who is John?

25          THE WITNESS:  John Castellucci, Big John.  He was the

J5N7CAS3                        Pennisi - Direct

1  captain of our crew, Boobsie's brother.

2              THE COURT:  What?

3              THE WITNESS:  Boobsie's brother.

4              THE COURT:  And you said you gave it to John sometimes

5  to give to somebody else?

6              THE WITNESS:  No, I gave it to John Sideburns to

7  sometimes give to John.

8              THE COURT:  So Johnny Sideburns is somebody else other

9  than Johnny Castellucci?

10             THE WITNESS:  Johnny Sideburns is another member of

11  our crew.

12 Q.  Just to make it clear, OK, do you recognize these two men?

13 A.  Yes.

14 Q.  Who is the man on my right hand?

15 A.  Big John.

16 Q.  And who is this man?

17 A.  Johnny Sideburns.

18 Q.  And they both go by John?

19 A.  John don't go by John.

20 Q.  What does he go by?

21 A.  Johnny Sideburns.  Well, Sideburns, just Sideburns.

22             THE COURT:  Identify them, please.

23             MR. SCOTTEN:  Sorry.  So John Castellucci was

24  identified as 3 and Johnny Sideburns 4.

25 Q.  Did you have an understanding of what John Castellucci did

1    or at least was supposed to do with the money you gave him?

2    A.  Yes.

3    Q.  What is that?

4    A.  $10,000 of it he was supposed to kick up to the

5    administration.

6    Q.  OK.  We talked a lot about the crew already.  What I want

7    to do now is can you name the members you recall who were in

8    your crew when you were made.

9    A.  Yes.

10   Q.  Who do you remember?

11   A.  There was Scotty Gervasi.

12              THE COURT:  Scotty --

13              THE WITNESS:  Gervasi.  Anthony Guzzo, myself, Joey

14   DiBenedetto.  There was a guy by the name of Danny Rizzo who

15   passed away shortly after.  There was Johnny Sideburns, and

16   there was Vinny Zappola.

17   Q.  So I'm going to show you -- I'm going to hand you what are

18   already in evidence as Government's Exhibits 214, 215 and then

19   216A, B and C.  Can you just flip through them and tell me if

20   you recognize them.

21   A.  Yes.

22   Q.  And are these generally pictures?

23   A.  Excuse me?

24   Q.  Are these pictures?

25   A.  These are pictures.

J5N7CAS3                           Pennisi - Direct

1    Q.  Do you know where they were taken?

2    A.  It was at Richie DeLuca's daughter's wake, I believe.

3    Q.  And who is Richie DeLuca?

4    A.  He is a captain from New Jersey in the family.

5    Q.  OK.  I want to start by showing the jury 216A.  Do you

6    recognize the men in this picture?

7    A.  Yes.

8    Q.  Who are they?

9    A.  It's myself and Anthony Guzzo.

10   Q.  This is the same Anthony Guzzo from the Pearl Room and then

11   later from the crew?

12   A.  Yes, I just forgot that Anthony was part of the crew too.

13   I forgot to mention him.

14   Q.  Can we go to 216B.  Do you recognize the men in this

15   picture?

16   A.  Yes.

17   Q.  OK.  So going from left to right, can you identify them?

18   A.  Vinny Zappola, Big John, Johnny Sideburns and Anthony

19   Guzzo.

20           THE COURT:  From left to right, you're talking about

21   from your left to right?

22           THE WITNESS:  I'm going from my left to my right.

23   Q.  The bald man on the far right, who is that?

24   A.  Anthony Guzzo.

25   Q.  And the man immediately next to him?

J5N7CAS3                              Pennisi - Direct

1    A.   Johnny Sideburns.

2    Q.   And the man wearing the black hat?

3    A.   Big John.

4    Q.   And the man on the left?

5    A.   Vinny Zappola.

6    Q.   And I don't remember if I asked you this already.  Do you

7    know Johnny Sideburns' real name?

8    A.   Cerrella.

9    Q.   Can we go to 215, please.  Do you recognize at least some

10   of the men in this picture?

11   A.   Most of them except the guy on the left looks very

12   familiar.  He is facing -- can't really see his face.

13   Q.   You don't know the man on the far left.

14   A.   I probably know him.  He is just facing -- I can't tell who

15   it is.

16   Q.   Do you know the other five men?

17   A.   Yes.

18   Q.   OK.  So starting second from the left in the back?

19   A.   His name is Gary.

20   Q.   And then next to him?

21   A.   That's Spanky.

22   Q.   And next to him?

23   A.   Scotty.

24   Q.   Do you know Scotty's full name?

25   A.   Gervasi.  Geraci, I think.

J5N7CAS3                          Pennisi - Direct

1            THE COURT:  Let's stop.  Geraci?

2            THE WITNESS:  Yeah, I think it's Geraci.

3            THE COURT:  G-E-R-A-C-I?

4            THE WITNESS:  Yeah.

5            I didn't hear the last question.

6            THE COURT:  You don't think what?

7            MR. SCOTTEN:  He said he didn't hear my last question,

8    your Honor.

9            THE WITNESS:  I didn't hear his last question.

10   Q.  On the far right?

11   A.  With the hat?

12   Q.  Yeah.

13   A.  Big John.

14   Q.  And in the front center shaking the hand of the man you're

15   not sure if you know.

16   A.  Boobsie.

17   Q.  How many of these men were in your crew when you were made?

18   A.  Two.

19   Q.  Were the defendant or his brother Spanky in your crew when

20   you were made?

21   A.  They were not.

22   Q.  Do you know if there is a reason for that?

23   A.  At that time the administration didn't want to put brothers

24   in the same crew.

25   Q.  Did that practice ever change?

1    A.  Yes.

2    Q.  When did it change?

3    A.  We had a new administration took over, and eventually he

4    was part of our crew.

5    Q.  The defendant?

6    A.  Yeah, him and Spanky became part of our crew.

7    Q.  Around when?

8    A.  2018?  2017?  In there, '18.

9    Q.  2017-18 time period?

10   A.  Yeah, might have been late '17.

11   Q.  You said a minute ago these pictures were taken at the

12   wake.  Did you know the deceased?

13   A.  No, I did not.

14   Q.  Why did you go to this wake?

15   A.  I was told -- I was told to go.

16   Q.  By who?

17   A.  Once again, it came from Johnny Sideburns.  It could have

18   came from John telling us to go.  It depends, sometimes one of

19   the members would call everybody and tell them we got a wake to

20   go to tomorrow, and we would all go.

21   Q.  And you said one of the members would call everybody else.

22   Members are all equal in rank?

23   A.  Yes.

24   Q.  So were the members passing on orders from somebody else?

25   A.  Captains, or higher in the administration would give word

1    that we want everybody to come to this wake.

2    Q.  This wake.  Was it just your crew or people from many

3    crews?

4    A.  It was basically the whole family, all the crews showed up.

5            MR. SCOTTEN:  Your Honor, are we taking a break this

6    afternoon or going to go straight through?

7            THE COURT:  We have another half hour.  Are you game

8    for it?

9            MR. SCOTTEN:  OK, we'll keep going.

10   Q.  So, I think you already mentioned the administration, but

11   let me show you 216C.  Do you recognize the people in the front

12   row of this picture?

13   A.  Yes.

14   Q.  So going from the left side of the screen to the right side

15   of the screen --

16           THE COURT:  Your left to your right.

17   A.  OK.  That's Joe DiNapoli, Stevie Crea and Matty Madonna.

18           THE COURT:  Who is the last guy?

19           THE WITNESS:  Matty Madonna.

20           THE COURT:  Matty McDonald?

21           THE WITNESS:  Madonna.

22   Q.  Is that the same Matty Madonna you have previously

23   identified as the acting boss of the family?

24   A.  Correct.

25   Q.  And the man on the left?

1          THE COURT:  Not the singer.

2          THE WITNESS:  Not the singer.

3    Q.  The man on the far left who you identified as Joe DiNapoli,

4    he was also present at your ceremony?

5    A.  He was.

6    Q.  And then the man in the center bottom row in the brown

7    jacket, who is that?

8    A.  It looks like a black jacket, but that's Stevie Crea.

9    Q.  You said he was not at your ceremony.

10   A.  He was not.

11   Q.  Can you remind the jury of the three ranks starting with

12   Madonna.

13   A.  Matty is the acting boss of the family.  Stevie Crea is

14   official underboss of the family.  And Joe DiNapoli was the

15   official consigliere of the family.

16   Q.  So you described two men as official and Madonna is only

17   acting.  What's the difference?

18   A.  Official obviously meant that they had the position

19   officially, and acting meant that Matty was acting for the boss

20   of the family.

21   Q.  Do you know who the boss of the family was?

22   A.  Yes.

23   Q.  Who is that?

24   A.  Vic Amuso.

25   Q.  And why couldn't Vic -- why did Vic Amuso need an acting

1    person?

2    A.  He's in federal prison.

3    Q.  Do you remember where you were first introduced to the

4    underboss Steven Crea?

5    A.  Yes.

6    Q.  Where was that?

7    A.  At the club in the Bronx, social club.

8    Q.  I'm going to show you what is in evidence as 240.  Do you

9    recognize this location?

10   A.  Yeah, that's the club in the Bronx.

11              THE COURT:  The what?

12              THE WITNESS:  The social club.

13              THE COURT:  The social club.

14   Q.  In the Bronx, is that correct?

15   A.  Yeah.

16   Q.  Between 2012 and 2017, how many times do you think you went

17   to the club in the Bronx?

18   A.  I went a lot.

19   Q.  In general terms, can you describe -- well, first, what

20   does it look like inside there?

21   A.  When you first walk in, to the right is like a round card

22   table, and then they sort of put smaller square tables together

23   to make a long table, and then there is a kitchen area, a

24   bathroom and kitchen area, small kitchen.

25   Q.  What would people typically be doing when you went there?

J5N7CAS3                         Pennisi - Direct

1   A.  Playing cards or sitting around talking and cooking and

2   eating.

3   Q.  Can any member of the public go into this club?

4   A.  No.

5   Q.  What are the requirements for going into this club?

6   A.  It was our club.  I mean there were just people -- I mean

7   people from the street just didn't walk in there.

8            THE COURT:  Who was there?  The Luccheses?

9            THE WITNESS:  The family was there, yeah, different

10  crews too, we all met there.

11           THE COURT:  Did you know each other, the crews?

12           THE WITNESS:  We did.  And if we didn't, we were again

13  introduced to whoever we had never met, different people.

14           THE COURT:  And you hung out in the club.

15           THE WITNESS:  Yeah, it was social.

16  Q.  Now you said different crews were in the club; is that

17  right?

18  A.  Yeah, the guys from the Long Island crew would be there,

19  guys from the Bronx, Manhattan, Brooklyn, Staten Island.

20  Q.  Do you know what crew the defendant was in when you were

21  first made before he came to your crew?

22  A.  Yes.

23  Q.  What crew was that?

24  A.  He was in the Bronx crew.

25  Q.  Do you know whose crew it was, who the captain was?

J5N7CAS3                          Pennisi - Direct

1    A.  It was Anthony Blue and his son Freddy Boy.

2    Q.  Two captains?

3    A.  Well, his son was an acting for the father.

4    Q.  I'm going to show the witness 211.  Do you recognize the

5    men in this picture?

6    A.  Yes.

7    Q.  Who are they?

8    A.  It's Boobsie and Anthony Blue.

9    Q.  And do you recognize the area where this picture was taken?

10   A.  It looks like the Bronx, but I'm not sure where it was.

11   Q.  Did you discuss business in the club?

12   A.  No.

13   Q.  What did you do when you were in the club and had to

14   discuss family business?

15   A.  Same procedure, just leave your phone.  We didn't even

16   bring our phones a lot of us into that club at all, but we

17   would go walk outside.

18   Q.  Other than as captain, did you see the defendant speak with

19   anybody else at the club?

20   A.  Yes.

21   Q.  Who were some of the people you remember seeing the

22   defendant speak with at the club?

23   A.  Matty, Stevie, Joe, you know, all the guys he would speak

24   with.

25   Q.  Did the defendant ever discuss any of his interactions with

1    Madonna with you?

2    A.  Yes.

3    Q.  What do you remember him saying?

4    A.  He was telling a story that he had done a score, and he

5    handed Matty 2500 and said take your wife to dinner.

6    Q.  What does the term score mean in your circles?

7    A.  Something illegal that you made money with.  It's not

8    specific.

9    Q.  It could be anything?

10   A.  It could be anything.

11   Q.  Did it have to be illegal?

12   A.  Yeah, I mean that's what the word score meant.

13   Q.  Did the defendant ever discuss any illegal business with

14   you?

15   A.  Yes.

16   Q.  What did he say?

17   A.  He asked me if I wanted to make some money, and he could --

18   he got his hands on some pounds of pot.

19   Q.  What did you say?

20   A.  I was just listening to him talk at the time, and he was

21   saying that sometimes you got to go outside of the rules to

22   make a few dollars.  I just said I'll ask around.

23   Q.  So, a couple things there.  First, when the defendant said

24   outside the rules, what did you understand him to mean?

25   A.  The rules of our life says that we do not deal with drugs.

1   Q.  What does our life mean?

2   A.  Being in the family, that was the rules, that there were

3   certain rules that was explained to me when I was inducted, one

4   of which was that we do not have anything to do with drugs.

5   Q.  And then I think you said you told him you would ask

6   around?

7   A.  Yes.

8   Q.  What did you mean by that?

9   A.  I just said it, but I meant that I would see if anybody

10   wanted it.

11   Q.  Did you in fact ask around to see if anybody wanted it?

12   A.  I did not.

13   Q.  Why did you tell the defendant you were going to?

14   A.  Excuse me?

15   Q.  Why did you tell the defendant you were going to if you

16   weren't going to?

17   A.  I just wanted to get out of the conversation.  I said I'll

18   ask around, and that was it and dropped it.

19   Q.  Mr. Pennisi, at the time did you like the defendant?

20   A.  Yeah.  I mean I just didn't -- I didn't like his character,

21   his personality.

22   Q.  At some point later do you believe Castelle did anything to

23   you personally?  Did you have any personal reason to dislike

24   him?

25   A.  Yes.

J5N7CAS3                        Pennisi - Direct

1   Q.  What was that?

2   A.  Supposedly he slept with my girlfriend.

3   Q.  Is this someone you're dating now?

4   A.  No.

5   Q.  How long ago was this?

6   A.  How long was?

7   Q.  That you were dating this woman.

8   A.  Over two and a half years ago, maybe closer to three.

9   Q.  When you learned about this or at least came to this

10  belief, how did you feel?

11  A.  I was angry.

12  Q.  A little angry or a lot?

13  A.  I was very angry.

14  Q.  Are you testifying today because you believe the defendant

15  slept with your ex-girlfriend three years ago?

16  A.  No.

17  Q.  Do you have any particular emotions about the defendant as

18  you sit here today?

19  A.  Today, no.

20  Q.  So, other than this opportunity to sell marijuana, did the

21  defendant discuss anything else he was doing to make money with

22  you?

23  A.  That he was doing to me?

24  Q.  Or trying to do.

25  A.  To me?  Yes.  He was -- he was complaining about Joey

 1   DiBenedetto.

 2   Q.   What did the defendant say about DiBenedetto?

 3   A.   That he kept asking Joey DiBenedetto to talk to Joe Fama

 4   who owned a construction company so that he could get a no-show

 5   job.

 6   Q.   Who is Joe Fama?

 7   A.   Joe Fama is with Little Joey DiBenedetto.  He is an

 8   associate of Joey's, and he's the owner of a general

 9   contracting company.

10   Q.   Do you know the name of the company?

11   A.   DiFama.   D-i-F-i-m-a.

12   Q.   Do you know if the defendant ever did get a no-show job

13   from DiFama Construction?

14   A.   He did not.

15   Q.   How do you know that?

16   A.   Because I discussed it with Joey, and Joey said he can

17   forget about that, it's not happening.

18   Q.   Do you know if the defendant -- based on your personal

19   observation, did the defendant in fact have money or income?

20   A.   He was always pulling out large amounts of money, but no.

21   Q.   You don't know where it came from.

22   A.   I have no idea.

23   Q.   I want to discuss with you some of the crimes that you

24   committed with the Lucchese family.  You said before you were

25   involved in gambling as an associate.  Did you stay involved in

1    gambling as a friend?

2    A.  Yes, a few years later I was doing gambling again.

3    Q.  You mentioned you committed assaults as an associate.  Did

4    you commit the assaults as a made member?

5    A.  Yes.

6    Q.  Did you ever use a weapon to hurt someone?  Did you ever

7    use a weapon to hurt someone?

8    A.  No.

9    Q.  Did you ever seriously injury someone?

10   A.  No.

11   Q.  Did you ever plan to seriously injury someone?

12   A.  Yes.

13   Q.  What is it that you were planning to do?

14   A.  We were watching a guy in Long Island, trying to get his

15   movements down.

16   Q.  For what purpose?

17   A.  To find the weakest point where we could assault him.

18   Q.  And why were you trying to assault this man?

19   A.  We were sent to assault him.

20   Q.  Who sent you?

21   A.  Big John.

22   Q.  Did you have an understanding of why Big John wanted this

23   man assaulted?

24   A.  Yes.

25   Q.  Why is that?

1    A.  It was for Stevie.

2    Q.  Who is Stevie?

3    A.  Stevie Crea.

4    Q.  The man you have identified before as the official

5    underboss?

6    A.  Correct.

7    Q.  Did you ever commit this assault?

8    A.  I did not.

9    Q.  Why not?

10   A.  It was just -- it was something that I didn't want to do,

11   but it was just too risky.

12   Q.  What do you mean by too risky?

13   A.  The guy lived in very far east Long Island.  There was like

14   one road in and one road out.  There were police cars in the

15   parking lots always talking in that area, and he lived on a

16   dead end block, and it was very, very quiet, very suburban

17   area.  It wasn't --

18   Q.  Did you also follow him to work?

19   A.  We were given his work address, and we didn't follow him

20   there.  We went to his job to see if that was a better area.

21   It was not.  There were surveillance cameras.  There were

22   several businesses, and there was a lot of cameras, you know,

23   in that area.  Just wasn't -- to me it wasn't a good -- it just

24   wasn't -- to me it wasn't feasible.

25   Q.  Did you ever lend out money as a made man?

J5N7CAS3                        Pennisi - Direct

1    A.  Yes.

2    Q.  About how much do you remember lending out?

3    A.  About $27,000.

4    Q.  Did you charge interest?

5    A.  I did.

6    Q.  How much?

7    A.  Three percent.

8    Q.  Three percent a year?

9    A.  No, three percent a week.

10   Q.  Three percent a week.

11   A.  Yes.

12   Q.  If a borrower ever refused to pay, could you have gone to

13   the police or courts to get paid back?

14   A.  No.

15   Q.  Why not?

16   A.  It was like a street loan, illegal loan.

17   Q.  Did you ever actually have to use force or tell someone you

18   are going to hurt them to get repaid?  Did you tell anybody you

19   were going to hurt them in order to get repaid?

20   A.  No.

21   Q.  Why not?

22   A.  The people that I lent it to, once again they knew who we

23   were, and they were paying us.

24   Q.  Did you ever use your membership in the Lucchese family to

25   help other people collect debts?

1    A.  Yes.

2    Q.  What did you do?

3    A.  A lot of times someone was owed money, and the person who

4    was not paying them, we would go take a trip, go to their

5    business or what not and tell them that they've got to pay this

6    money, intimidate them.

7    Q.  Did you or the people in the family you were working with,

8    did you ever do anything else to get business advantages out of

9    being in the Lucchese family?

10   A.  I'm sorry, I didn't hear you.

11   Q.  Let me be more specific.  In the fiber-optic industry, did

12   you ever do anything to get advantage using your family

13   membership?

14   A.  Yes.

15   Q.  What did you do?

16   A.  We -- again we intimidated by our presence subcontractors.

17   We -- I took over the safety part of the job.  I put two safety

18   people there.  I was getting what was supposed to be a no-show

19   paycheck, but I used to show up, and I used to show up to the

20   job when I could, because I was working during the daytime, and

21   I would go after my regular job to Long Island or where this

22   work was being done, and I would check on the safety people.

23   If they were in Jersey, I went and checked on them.

24   Q.  What part of this is illegal or involved the mob?

25   A.  Well, for all intents and purposes it was a no-show job for

1     myself because I wasn't going there every day.  Our presence

2     alone was there to intimidate these subcontractors into

3     charging what we wanted them to charge for the contract, and

4     the company was billing a bigger company who hired them.

5     Q.  Do you have a sense of how much you profited from this?

6     A.  Myself?

7     Q.  Yeah, you personally.

8     A.  It didn't last long, so maybe the most 9, $10,000.  It

9     didn't last that long.

10    Q.  Has there been a change in the administration of the

11    Lucchese family since you became a member?

12    A.  Yes.

13    Q.  So you said earlier that Matty Madonna was the acting boss.

14    Who is the acting boss now?

15    A.  The last I remember was Mikey DeSantis.

16    Q.  So around when you --

17              MR. MCMAHON:  I didn't hear the last name.

18              THE COURT:  What's the last name?

19              THE WITNESS:  DeSantis.

20              THE COURT:  D-I --

21              THE WITNESS:  No, I think it's D-e.

22              THE COURT:  S-A-N-T-I --

23              THE WITNESS:  S-a-n-t-i-s.

24    Q.  Were you at all involved in the change between Madonna and

25    DeSantis?

J5N7CAS3                            Pennisi - Direct

 1    A.  Yes.

 2              THE COURT:  Don't drop your voice.

 3              MR. SCOTTEN:  Thank you, Judge.

 4    Q.  What was the first thing you did as part of this

 5    transition?

 6    A.  I was asked to send a message.

 7    Q.  Who asked you to send the message?

 8    A.  Patty Dello Russo asked me to send a message to Little

 9    Joey.

10    Q.  What was the message?

11    A.  The message was that they wanted to get a message to Vic

12    Amuso, the boss in prison, that there were guys out here very

13    loyal to him and that they were willing to step into these

14    administrative positions.  There was a big arrest, so there was

15    some vacancy in these positions.

16    Q.  And why is DiBenedetto the person to bring this message to

17    Amuso?

18    A.  He's Vic Amuso's son-in-law; he's married to his daughter.

19    Q.  And did you in fact take this message to DiBenedetto?

20    A.  I didn't take the message.  I went and spoke to Joey.  I

21    never discussed it with him.

22    Q.  Why not?

23    A.  Because when I got there he was complaining about Boobsie.

24    Q.  What did DiBenedetto tell you about Boobsie?

25    A.  That Boobsie also was trying to get messages to Vic Amuso

1   through Joey, saying that he would take over as the boss of the

2   family.

3   Q.  And how did DiBenedetto feel about that?

4   A.  He was --

5   Q.  What did he say about it, to be more precise?

6   A.  He said, could you believe this guy?  And I said, yes.

7   Q.  So why didn't you give your own message then?

8   A.  Because Joey was complaining that -- he says these guys,

9   you know, they're coming to give me messages, and they should

10  go -- use protocol.  They should go to their skipper, their

11  captain, and say they want to send a message and let them send

12  it that way.  He didn't want them going through him.  He didn't

13  want to be involved in it at all.

14          So, after listening to him go on and on and on, I

15  wasn't going to now give him the same kind of message.  I just

16  kept my mouth closed.  I know obviously if he is not going to

17  do it for them, for Boobsie or anybody else, he's not going to

18  do it for who I'm giving the message for.  He was adamant he

19  didn't want no part of it.

20  Q.  Was there eventually a change in the family leadership?

21  A.  Yes, there was.

22  Q.  And was the transition peaceful?

23  A.  It was peaceful.

24  Q.  Were you prepared to use violence to accomplish it?

25  A.  Yes.

J5N7CAS3                      Pennisi - Direct

1    Q.  Did you discuss this with others?

2    A.  It was discussed with me, yes.

3    Q.  So who came to you?

4    A.  Again, Patty Dello Russo came to me.

5    Q.  And just to be clear, who is Patty Dello Russo at this

6    time?

7    A.  He is another member of the Long Island crew.

8    Q.  And what did Dello Russo say to you, as best you remember?

9    A.  He had said that they were going to have a meeting with

10   Stevie, they were going to -- there was -- after I didn't send

11   the message, I just said that I don't think he is going to do

12   it.  I didn't say that I didn't give the message.  I just said,

13   no, Joey is not going to do it, you know, it's not going to

14   happen.  They said we'll go about it in a different way.

15        There was a letter somehow sent to Vic I would assume

16   in code.  I don't know how the letter was -- I don't know how

17   he got the letter.  I don't know about that, but I know there

18   was a letter explaining exactly what the message was, that

19   there was a crew of guys very loyal to him out here; they were

20   all Brooklyn guys.  The administration of the family had

21   shifted to the Bronx.  They wanted to take the family back to

22   Brooklyn.  That's really what this was about.

23        And so it was explained that there was a letter

24   written to Vic, and he approved that -- you know, he -- he

25   okayed -- he was OK with them taking these positions in the

J5N7CAS3                          Pennisi - Direct

1    family, and so they were going to have a meeting with Stevie

2    Crea to show him the letter, because there was a letter written

3    back, and explain that they were ready to move into these

4    positions.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J5NVCAS4                              Pennisi - direct

1    BY MR. SCOTTEN:

2    Q.  And just so I'm clear, the letter written back is from who?

3    A.  Vic Amuso.

4    Q.  And what did Dello Russo say to you about the possibility

5    of Stevie Crea not going along with it?

6    A.  He said that hopefully it goes well, it goes peaceful.

7    Stevie was potentially going to have a case soon.  They assumed

8    that there was a case coming up for him.  But in the event that

9    they balked or they wanted to stand -- hold their positions,

10   they were against it, that we would deal with the guys from the

11   Bronx.

12   Q.  Did Dello Russo ask you if you would be a part of this?

13   A.  He said, I know that we -- we got to ask you that you could

14   be a part of this with us, handling this.

15            So I said, You don't.

16   Q.  What did you understand "handling this" to mean?

17   A.  Excuse me?

18   Q.  What did you think "handling this" meant, when Dello Russo

19   said "handling this"?

20   A.  We would have killed members of the Bronx.

21   Q.  Did Dello Russo ever discuss with you specific names?

22   A.  Yes.

23   Q.  Who are some of the people he discussed?

24   A.  Stevie, Stevie Jr., Freddy Boy and his father Anthony Blue,

25   there was Joe Labrano, a fellow named Frankie.  I forget his

1    last name.  Frankie Salerno, that was his name.  And somebody

2    by the name of Andrew DeSimone.

3    Q.  These people that Dello Russo listed, what do they have in

4    common?

5    A.  These were Bronx faction, the Bronx faction of the family.

6    These people were kind of, I guess, people to be concerned

7    about, if they were going to make a move on a family.

8    Q.  Were they all made members of the Lucchese family?

9    A.  Members and captains.

10   Q.  As we sit here today, do you still consider yourself to be

11   a member of the Lucchese family?

12   A.  I am not.

13   Q.  Around when did your relationship with the Lucchese family

14   start to change?

15   A.  Around late 2017.

16   Q.  Was there a single event or many events that caused that

17   relationship to change?

18   A.  Many events.

19   Q.  I'm not going to ask you about all of them, but what is the

20   first event you remember as you sit here today started changing

21   things?

22   A.  There was just some things that took place that caused me

23   concern.

24   Q.  What's the first one that you remember?

25   A.  Big John had come to me and Johnny Sideburns.  And he said

J5NVCAS4                          Pennisi - direct

1    that he wanted to talk to us; and that it's been discussed in

2    the family that they believe that two members in this family

3    were wearing wires.  And I was just baffled at why he was even

4    bringing this up.

5              Johnny Sideburns had lifted his shirt up as a joke

6    that he wasn't wearing a wire.  I got very angry at him for

7    doing that, because this was a serious -- you know, as it could

8    get -- you could get killed if you were wearing a wire.

9              I went outside after that -- sorry.  I said to John,

10   Why don't you find out who they are.  And --

11   Q.  To be clear, why is this a concern to you?  Why does this

12   cause you concern?

13   A.  Because there was other guys around.  He just came to me

14   and Johnny Sideburns, and I didn't understand why was he coming

15   to me and him talking about this.  He didn't get everybody

16   together as a group; just like kind of singled us out.  And I

17   didn't like the way he -- like he was -- like he was implying

18   something and I got very angry.  I says, Well, why don't you

19   find out who they are then.

20   Q.  Let me ask you this:  This is the first of many events?

21   A.  Yes.

22   Q.  Can you briefly list some of the other events that caused

23   you these concerns?

24   A.  Yes.

25              The next cause of concern was that I was asked to go

J5NVCAS4                          Pennisi - direct

1    to one of the captains' house.  And I did.  I went there, Dom,
2    I went to Dom's house.  There was a bunch of guys sitting
3    around a small, like, dining room table.  And one guy was
4    standing behind the island, like behind them.  And I was asked
5    to sit in a seat which would have -- my back would be to the
6    guy that was standing behind the island.
7           And Dom, who had just been arrested on some case had
8    asked me if I knew who the rats were.  It was two -- Do you
9    know who two rats are in my case, he said.  And again, I was
10   baffled, because I didn't even know what Dom was charged with,
11   I knew nothing about his case at all.  And I didn't like that
12   the guy was standing behind me the whole time.
13   Q.  Before we move on, do you know Dom's last name?
14   A.  Truscello.
15             THE COURT:  Spell it.
16             THE WITNESS:  I think it's --
17             THE COURT:  F-A-S?
18             THE WITNESS:  No, no, no.  It's T, T, like in "Tom."
19   T-R-U-S -- I think it's C.
20             THE COURT:  Pronounce it again.
21             THE WITNESS:  Truscello.
22             THE COURT:  Truscello.  Probably T-R-E-C-U-L-L-O?
23             THE WITNESS:  I think there's an E in there somewhere.
24   I'm not sure.
25   BY MR. SCOTTEN:

J5NVCAS4                          Pennisi – direct

1    Q.   And did you ever see something that –- see something that

2    physically caused you concern?

3    A.   Yes.

4    Q.   What is that?

5    A.   So later, at this point, I'm kind of staying –- I went

6    to –- there was one more incident that took place before that.

7    There was a wake, another wake that a family all gathered to.

8    It was for Dom, the house I went to; his wife had passed away.

9           And everybody at the wake was acting not the same to

10   me anymore.  People were saying hello, walking away from me.

11   It wasn't –- you know, we had a different kind of relationship

12   where we used to talk and greet each other.  Everybody was kind

13   of keeping their distance from me.  And it was definitely a big

14   concern, because, you know, why were they acting this way?  It

15   was like something not right.

16   Q.   Did you actually see something that caused you concern?

17   A.   Yes.

18   Q.   What is that?

19   A.   So I started, after the wake, keeping my distance.  I was

20   trying –- on my own trying to figure out what is going on.

21           I had lived in Levittown, Long Island in an apartment.

22   And I was always looking around; you know, we were always

23   looking out for the FBI always watching us.

24           And I had seen a car that was parked down the block

25   from my house that definitely was out of place.  So I got back

1    in my car and I drove down to this car.  And there was two guys

2    sitting in the car and they had baseball hats on.  And the

3    driver, when I pulled up and looked, he kind of turned his face

4    away, and then the passenger pulled his baseball cap completely

5    over his face.

6    Q.   Why is that concerning?  Couldn't they be FBI agents?

7    A.   They could have, but the problem is is that I didn't know

8    any FBI agents like that or any law enforcement where they

9    could have just both turned away.  Whoever that was, was

10   someone that knew that I was going to recognize their face.

11   They pulled their cap over their face.

12          And I also know that I did lay on a guy to get his

13   routine down.  And that's the first thing that, in that life,

14   that they do; they want to start getting your routine down,

15   what time you come home, what time you leave, which way you go,

16   you know, they start getting a pattern with you.  So it was a

17   big, big concern to me.

18   Q.   Did you eventually arm yourself?

19   A.   Yes, I did.

20   Q.   To be clear, was it legal for you to possess that gun?

21   A.   It was not.

22          THE COURT:  Slow down your questions.

23          MR. SCOTTEN:  Yes, Judge.

24   Q.   Did you try to stay away from the family?

25   A.   I did.  I kept my distance.  And I kept getting phone

J5NVCAS4                         Pennisi - direct

1    calls.  I went to a few meetings about trying to see, armed,

2    because I didn't know if I would walk out of these meetings.

3    To try and see what the issue was, what was going on, why I

4    was -- what was causing this change in people.  Nobody was

5    acting the same no more, and what was that car about.  And, you

6    know, so I tried to stay away.

7    Q.  Did the family leave you alone?

8    A.  They did not.

9    Q.  Turning to October of 2018, what did you do?

10   A.  I just -- I had -- before that I had left and went to

11   Savannah, Georgia, to try to get away.  Unfortunately, I

12   couldn't.  I couldn't survive there because of my record; they

13   wouldn't hire me.

14        I came back home.  I had to keep switching my jobs,

15   people showing up at my job, telephone calls, texts,

16   everything.  And I just -- my location, I had moved, I had to

17   move again.  I had to move my -- to another apartment, and it

18   was all becoming costly.  And I just didn't know what to do

19   anymore.  I couldn't just keep moving and changing --

20   Q.  So Mr. Pennisi, did you do in October of 2018?

21   A.  I'm sorry.  I went to the headquarters in Manhattan of the

22   FBI office.

23   Q.  And when you first went to the FBI, did you speak with

24   special agents?

25   A.  There was two guys who came down and said that they

J5NVCAS4                          Pennisi - direct

1    couldn't really talk to me.  They were part of a terror --

2    terrorist task force or something like that.

3    Q.  Did you eventually end up speaking with, sort of, the right

4    agents?

5    A.  Yes.

6            THE COURT:  What do you do, come in and say -- what do

7    you say?  You come into FBI headquarters, what do you say?

8            THE WITNESS:  I said that this is my name, I'm a made

9    member of the Lucchese crime family.  Can somebody come down

10    here and speak to me.

11            They took a while, and they came down.  And they said,

12    We looked your name up; we know who you are.  But we're the

13    wrong people for you to talk to.  But we're going to get the

14    right people to reach out to you.  And I left.

15    Q.  When you first ended up speaking with the right people at

16    the FBI, did you have an attorney?

17    A.  I did not.

18    Q.  What did you discuss at these first meetings?

19            THE COURT:  Can this be the last question?

20            MR. SCOTTEN:  I think it can, your Honor.

21    A.  I discussed what I just explained, all those concerns.

22    That was the first -- exactly what was taking place.  Trying to

23    figure out what was going on, what was the sudden change in the

24    way people were acting with me, the car at my house.  I

25    discussed all those things.

J5NVCAS4                          Pennisi - direct

1          THE COURT:  Did you live alone at that time?

2          THE WITNESS:  I lived alone.  And then every other

3   weekend my young daughter came, so that was a big --

4          THE COURT:  How old was she?

5          THE WITNESS:  At that time she was about five or six

6   years old.

7          THE COURT:  Somebody drop her off?

8          THE WITNESS:  I used to pick her up.

9          THE COURT:  Bring her home?

10          THE WITNESS:  Bring her home.

11          Where I was living, it was like a back alley; you had

12   to go to a drive alley.  It was very dark.  I was -- my heart

13   was in my throat every time I had to put her in the car, take

14   her out.  I figure if the car pulls up, maybe they don't see

15   her, they start shooting.  It was a hard time for me.

16          THE COURT:  Let's stop there.

17          Members of the jury, close up your books, give it to

18   Ms. Jones on the way out.

19          Have a very pleasant memorial weekend.  And don't

20   think about the case.  You'll think about it next week.

21          Don't discuss anything with anybody about the case.

22          Keep an open mind.  See you Tuesday at 10 o'clock.

23          (Jury not present)

24          (Witness excused)

25          (Adjourned to May 28, 2019, at 10 o'clock a.m.)

```
1                      INDEX OF EXAMINATION

2   Examination of:                              Page

3    SALVATORE LEOTTA

4   Direct By Mr. Fiddelman . . . . . . . . . . 285

5   Cross By Mr. Mcmahon . . . . . . . . . . . . 299

6   Redirect By Mr. Fiddelman . . . . . . . . . 306

7   JOSEPH ANEMONE

8   Direct By Mr. Scotten . . . . . . . . . . . 307

9   Cross By Mr. McMahon . . . . . . . . . . . . 341

10   KEVIN BEYER

11  Direct By Mr. Fiddelman . . . . . . . . . . 365

12   JOHN PENNISI

13  Direct By Mr. Scotten . . . . . . . . . . . 379

14                    GOVERNMENT EXHIBITS

15  Exhibit No.                              Received

16   140   . . . . . . . . . . . . . . . . . . . 289

17   126   . . . . . . . . . . . . . . . . . . . 292

18   130 and 132   . . . . . . . . . . . . . . . 292

19   133   . . . . . . . . . . . . . . . . . . . 294

20   108   . . . . . . . . . . . . . . . . . . . 297

21   111   . . . . . . . . . . . . . . . . . . . 299

22   143   . . . . . . . . . . . . . . . . . . . 309

23   129   . . . . . . . . . . . . . . . . . . . 330

24   160, 161   . . . . . . . . . . . . . . . . . 337

25   400 and 402   . . . . . . . . . . . . . . . 371
```